17428

COLONIAL LIFE & ACCIDENT INSURANCE CO., Respondent, v. SOUTH CAROLINA TAX COMMISSION, Appellant

(103 S. E. (2d) 908)

130

*Messrs. T. C. Callison, Attorney General,* and *James M. Windham, Assistant Attorney General,* of Columbia, *for Appellant,*

134

*Messrs. S. Augustus Black* and *McKay, McKay, Black & Walker,* of Columbia, and *Boyd, Bruton & Lumpkin,* of *Columbia, of Counsel, for Respondent,*

*Messrs. Robinson, McFadden & Dreher,* of Columbia, *for Liberty Life Insurance Company,*

May 20, 1958.

As Amended June 15, 1958.

LEGGE, Justice.

Appellant assessed against respondent, a domestic corporation engaged in the business of life and accident insurance, additional license taxes for the years 1950-1953, inclusive, in respect of dividends on shares and interest on deposits owned by it in building and loan associations located in South Carolina, Alabama, Georgia, North Carolina and Tennessee, and also in respect of interest received on bonds of the cties of Valdosta, Georgia and Tuscaloosa, Alabama, owned by it. Respondent paid under protest the taxes so assessed, plus interest, and brought this action pursuant to Section 65-2662 of the 1952 Code to recover the amount so paid.

In the court below, respondent challenged the assessments upon the following grounds:

1. That, properly construed, Section 97 of Act No. 1053 of 1950 (Act June 3, 1950, 46 Stat. at L. 2656), under which the assessment for the year 1950 was levied, and Section 96 of Article I of Act No. 379 of 1951 (Act April 19, 1951, 47 Stat. at L. 656), under which the assessments for the years 1951, 1952 and 1953 were levied, do not apply to and make taxable: (a) income from shares or deposits in building and loan associations either within or without the State of South Carolina, or (b) interest on bonds of municipalities without the said State.

2. That, as construed by appellant, the sections of the 1950 and 1951 Acts before mentioned are arbitrary, discriminatory, and not based upon a reasonable classification for tax purposes, and are therefore, as to respondent and

others similarly situated, violative of the due process and equal protection clauses of the State and Federal Constitutions.

3. That Section 96 of Article I of the 1951 Act contravenes Article III, Section 17 of the Constitution of South Carolina, in that its subject is not expressed in the title of that Act.

The trial court sustained respondent's position under the first of these grounds, rejected its contentions under the other two, and decreed the relief prayed for; and from that decree the Tax Commission has appealed.

In due time after service upon it of appellant's proposed case for appeal, respondent served upon appellant proposed amendments thereto, among them the addition, as "Additional Sustaining Grounds":

1. That the trial court should have held the statutes in question, as construed by appellant, violative of the due process and equal protection clauses of the State (Art. 1, § 5) and Federal (Amend. 14) Constitutions; and

2. That the trial court should have held that Section 96 of Article I of Act No. 379 of 1951 was in contravention of Article III, Section 17 of the Constitution of South Carolina.

The proposed amendments having been disallowed by appellant, the matter came before the trial judge for settlement of the case for appeal. By his order of October 8, 1957, he excluded from the case for appeal these "Additional Sustaining Grounds", stating as his reason therefor: "I have carefully considered the arguments of the parties as covered in their briefs and I am of the opinion that the matter attempted to be raised by the Additional Sustaining Grounds is an attempt by plaintiff-respondent to raise questions on appeal which were presented in the Court below and specifically ruled upon adverse to the plaintiff-respondent. No objection was made to these rulings by plaintiff-respondent; no appeal taken therefrom, and time therefor has long since expired."

On October 14, 1957, respondent served upon appellant notice of intention to appeal from the order settling the case, and "that such appeal will be based upon appropriate portions of the record to be embodied in an Appendix to the Brief of Respondent".

On March 18, 1958, respondent served upon appellant notice that upon the opening of this court on the day when the appeal herein would be argued it would move this court for leave to file "for the consideration of the court, an Appendix to the case for Appeal as settled, to be annexed to its brief", the "Additional Sustaining Grounds" before mentioned, the trial judge's order settling the case for appeal, and respondent's exceptions to that order. The notice stated that "the grounds of such motion are that the contents of such appendix could not, under the order of the Presiding Judge dated October 8, 1957 settling the case for appeal, be included in the Transcript of Record, and that the motion may be requisite under Supreme Court Rule 8, Section 7."

Respondent's brief here is followed by an appendix, stated to have been inserted under authority of Rule 4, Section 7 of this court. This appendix consists of:

1. The "Additional Sustaining Grounds" as presented to the court below;

2. The order of the lower court dated October 8, 1957, settling the case for appeal; and

3. Respondent's exceptions to the order settling the case for appeal, the same assigning error on the part of the trial judge in excluding from the transcript of record the "Additional Sustaining Grounds" before mentioned.

Respondent's motion last mentioned was resisted by appellant, and briefs on both sides have been filed with this court. The importance of the questions raised by the "Additional Sustaining Grounds" requires their determination; and we shall determine them. But since both the parties and the lower court appear to have misapprehended the rule governing presentation in this court of "additional grounds"

for sustaining the judgment of the trial court, we shall first endeavor to clarify that rule and the procedure thereunder.

The pertinent portions of Rule 4, Section 7 are:

"When the appellant shall serve a proposed case * * * the respondent shall, within ten days thereafter, serve upon appellant any proposed amendment thereto, including any additional grounds upon which this Court will be asked to sustain the rulings or judgment below * * * If all amendments proposed are not agreed to, the appellant shall, within four days after service upon him, serve upon respondent notice of his allowance or disallowance of each proposed amendment, and, at the same time, serve notice of the time and place at which the case will be submitted to the trial Judge for settlement * * *. Any party aggrieved by the order of settlement, may appeal thereupon and insert in an appendix to the case as settled, such matters as may be necessary for the proper consideration of his appeal. * * *"

It seems that as late as 1884, when *Walker, Evans & Cogswell Co. v. Bollmann Bros.,* 22 S. C. 512, was decided, a respondent was not permitted to urge, as a ground for sustaining the judgment of the trial court, a matter upon which that court had found adversely to him, except by appeal from such finding. But as early as 1889 (*Hardin v. Clark,* 32 S. C. 480, 11 S. E. 304) the practice of giving notice of "additional sustaining grounds" appears to have been recognized, although there was no rule of court thereabout. On December 22, 1892, Rule V of this court, relating to the "case" on appeal, was amended by the addition of the following: "If a Respondent in a case, in which such a practice is allowed, desires to sustain the judgment appealed from upon other grounds than those upon which it is rested by the Circuit Judge, he must give written notice thereof to the Attorney for Appellant stating the additional grounds upon which he proposes to rely; and said notice must be served in time to have the same printed in the 'Case' as prepared for argument in the Supreme Court." Rev. Stat.

1893, Vol. 2, p. LXII; Code of Laws 1902, Appendix to Vol. II, at p. 265.

Since the 1892 amendment the rule has not required, as a condition precedent to respondent's urging affirmance on such additional grounds, either exception to or appeal from the trial court's ruling on such matters. But the relief from such requirement afforded by the rule as so amended appears to have been overlooked by counsel in one case and by this court in another. In *Cothran v. Knight,* 1894, 45 S. C. 1, 22 S. E. 596, where plaintiff had appealed from an order of nonsuit, the "case" showed that respondents had excepted to the trial judge's order overruling their demurrer to the complaint; but this court, reversing the judgment of nonsuit, declined to consider the respondents' exceptions because respondents had not given notice (referred to in the syllabus as "the usual notice") to appellant's counsel that they desired to sustain the judgment appealed from upon other grounds than those upon which the circuit judge had rested it. And in *Hyder v. Metropolitan Life Insurance Co.,* 1936, 183 S. C. 98, 119, 190 S. E. 239, 248, where the respondent had asked that the judgment of the lower court be sustained upon certain grounds, the court said: "As to the first and second of these we may say that it does not appear from the record that respondent excepted to nor appealed from the rulings of the presiding judge touching the matters therein referred to."

The purpose of the 1892 amendment, as now embodied in the quoted provisions of our present Rule 4, Section 7, was, and is, to relieve a respondent who, in the trial court, has obtained a judgment giving him all the relief that he sought, from the necessity of appealing from adverse rulings that did not affect the result of the lower court's decision. To be entitled to consideration under this rule, an "additional ground" for affirmance must relate to a matter that was presented before the trial court for its ruling, *Carter v. Peace,* 229 S. C. 46, 93 S. E. (2d) 113; and it must be such that its acceptance would lead to the

same result that the trial court reached, *United States Rubber Co. v. White Tire Co.,* 231 S. C. 84, 97 S. E. (2d) 403. Fairness to the appellant of course requires that he be given adequate notice of the additional grounds upon which respondent will rely for affirmance; and it is for the purpose of affording such notice that the rule provides that such grounds be stated by respondent when he serves his proposed amendments to appellant's proposed case. The phraseology of the rule, that "the respondent shall, within ten days thereafter, serve upon appellant any proposed amendment thereto (*i. e.* to the proposed case), including any additional grounds upon which this Court will be asked to sustain the rulings or judgment below", suggests that the "additional sustaining grounds" are by way of amendment to the proposed case; but they are in fact addenda, rather than "amendments", as will appear by reference to Section 1 of Rule 4, which prescribes the contents of the "Case", or "Return", or "Transcript of Record".

The trial judge, in settling the case for appeal, may properly decline to permit the proposed "additional grounds" to be printed at the end of the transcript of record where they relate to matters that were not before the trial court; but to deny respondent the right to incorporate them in the record upon the ground that he has not appealed from the trial court's adverse rulings thereabout would defeat the very purpose of the rule.

We note here that although respondent may be restricted in argument to additional sustaining grounds of which he has given notice as required by Section 7 of Rule 4, this court may, under Section 8 of that rule, affirm upon any grounds appearing in the record. Cf. *Green v. City of Bennettsville,* 197 S. C. 313, 15 S. E. (2d) 334.

In the case at bar, the trial judge having refused to permit the "additional sustaining grounds" to be printed in the transcript, respondent, having appealed from the order settling the case for appeal, should have printed them as an appendix to the case as settled, and not

as an appendix to its brief. Rule 4, Section 7 so provides. Rule 8, Section 7 relates to "facts" not appearing in the transcript; it is not applicable to the situation here.

We come now to consider respondent's contention that Section 96 of Article I of Act No. 379 of 1951 contravenes Article III, Section 17 of the Constitution of this State for the reason that its subject is not expressed in the title of that Act. Except as hereinafter noted, the provisions of Section 96 of Article I of Act No. 379 of 1951 are identical with those of Section 97 of Act No. 1053 of 1950. Each of these acts made appropriations to meet the expenses of the State government for the fiscal year bginning on July 1 following its passage; and each contained legislation concerning other matters also, some of which provisions were, in the 1951 act, expressly declared to be a part of the permanent law of this State. The 1950 act was entitled: "An Act To Make Appropriations To Meet The Ordinary Expenses Of The State Government For The Fiscal Year Beginning July 1, 1950; To Regulate The Expenditures Of Funds Therefor; For Borrowing Money; To Raise Revenue For The Support Of The State Government By Imposing An Additional Tax Upon The Sale Of Cigarets In This State; By Increasing The Tax Rate On The Sale Of Beer; By Levying A Tax On The Sale Of Alcoholic Liquors And Beer And Wine In This State; To Levy An Additional Tax Of One (1¢) Cent Per Gallon On Gasoline, Or Substitutes Therefor For The Fiscal Year 1950-51 And Three Years Thereafter, And To Provide For The Disposition Of The Proceeds Of Said Additional Tax; To Authorize The Issuance Of Additional Bonds By The Highway Department For The Construction Or Improvement Of The Secondary Road System In This State, And To Adjust The Highway Debt Limit Thereto; To Levy A Tax On Certain Investment Income Of Insurance Companies; To Repeal Section 571-1 Of The Code Of Laws Of South Carolina Relating To Broadcasting By Radio Athletic Contests Between South Carolina Institutions Of Higher Learning; And Further Relating To The Fiscal Affairs Of The State Of South Carolina".

Section 97 read as follows:

"(a) That in addition to any and all other taxes and licenses now levied, assessed, collected, and paid, in respect to corporations, organizations, or associations engaged in the business of writing insurance contracts, a license tax is hereby imposed upon every such corporation, organization, or association in an amount equivalent to four and one-half (4½%) per cent of the entire net investment income, as hereinafter defined, of such corporation, organization, or association.

"(b) Investment income, as herein used, shall include all money or income received on account of ownership in or use of real or personal property situated within the State of South Carolina and all income arising from any form of business or trade whatsoever in the State of South Carolina, except that investment income, as herein used, shall in no case include income arising from (1) premiums paid for an insurance contract; (2) mortgage loans; (3) Policy loans and/or (4) bonds or securities of the State of South Carolina and its political subdivisions.

"(c) Where items of expense cannot be definitely attributed to the production of the income required to be included in the measure of the tax imposed by this Section, but relate to both investment income and income from premiums paid for insurance contracts, there shall be allowed, as a deduction from investment income, a proportion of such items of expense as the total investment income in South Carolina bears to the total gross income, including all premiums paid for insurance contracts. The tax imposed by this Section shall not be deducted as an expense in computing net income.

"(d) For the purpose of facilitating the determination of the net income herein declared to be the measure of the license tax imposed by this Section, and for the purpose of administration, enforcement, collection, liens, penalties, and other provisions of enforcement, all the provisions of Section 435 through Section 2479, Code of Laws of South Carolina for 1942, that may be appropriate or applicable, are

hereby adopted and made a part of this Act. The South Carolina Tax Commission shall administer and enforce the tax herein imposed.

"(e) The Tax Commission may, from time to time, make such rules and regulations, not inconsistent with this Section, as it may deem necessary to enforce and administer its provisions, and such rules and regulations shall have the full force and effect of law.

"(f) This Section shall take effect immediately upon its approval by the Governor and shall apply to all income earned on or after January 1, 1950."

The title of the 1951 act, although similar to and much longer than that of the 1950 act, made no express reference to the tax provisions contained in Section 96 of Article I thereof, which were in language identical with that of Section 97 of the 1950 act except that at the end of subsection (f) was the following provision: "This section shall constitute a part of the permanent law of the State of South Carolina."

Article III, Section 17 of the Constitution declares that "every Act or resolution having the effect of law shall relate to but one subject, and that shall be expressed in the title". Its purpose is to prevent the General Assembly from being misled into the passage of bills containing provisions not indicated in their titles, and to apprise the people of the subject of proposed legislation and thus give them opportunity to be heard if they so desire. Accordingly, while it is to be construed with great liberality so as not to embarrass or obstruct needed legislation, liberality of construction should not be extended to such a point as to foster the abuses which its provisions are designed to prevent. *Dantzler v. Callison,* 230 S. C. 75, 94 S. E. (2d) 177. In *State ex rel. Roddey v. Byrnes,* 219 S. C. 485, 66 S. E. (2d) 33, the General Appropriations Act of 1951 was held not violative of Article III, Section 17; but the question there involved was whether or not its provisions relating to the issuance of State bonds, specifically referred to in the title,

were relevant to the subject of the act. A different question is here presented. It is true, of course, that the title of an act need not be a complete index of its contents, and that the constitutional mandate is satisfied where the title states the general subject and the provisions in the body of the act are germane thereto and provide the means, methods or instrumentalities for the accomplishment of the general purpose. *Gasque v. Nates,* 191 S. C. 271, 2 S. E. (2d) 36; *McCollum v. Snipes,* 213 S. C. 254, 49 S. E. (2d) 12; *Caldwell v. McMillan,* 224 S. C. 150, 77 S. E. (2d) 798. It is true, also, that the subject of the act under consideration is, broadly viewed, state finances; and that the license tax imposed by Section 96 of Article I is not wholly unrelated to that subject. But we do not think that such permanent legislation is so inherently a part of the ordinary fiscal affairs of the state as to justify, within the meaning of Article III, Section 17, its incorporation into a general appropriation act without reference to it in the title of that act. We conclude, therefore, that the 1951 act was, as to Section 96 of Article I thereof, invalid because violative of the constitutional requirement before mentioned.

The 1951 act was approved by the Governor on April 19, 1951, and Section 96 of Article I thereof was incorporated into the 1952 Code of Laws as Sections 65-931 through 65-936. Did such codification validate this legislation, which had been invalid, for the reasons before stated, when it existed only as a part of the 1951 act? If it was properly incorporated into the 1952 Code, it became, without reference to the title of the act of which it had been a section, and therefore despite the inadequacy of that title, a part of the only general statutory law of the state. *Parks v. Laurens Cotton Mills,* 75 S. C. 560, 56 S. E. 234; *Nexsen v. Ward,* 96 S. C. 313, 80 S. E. 599; *State v. Freeland,* 106 S. C. 220, 91 S. E. 3.

Respondent argues that since the Code Commissioner's report had been submitted to the General Assembly, as required by Article VI, Section 5 of

the Constitution, on the first day of its 1951 session (*i. e.*, January 9, 1951), and since the same constitutional provision requires that the report shall not be taken up for consideration until the next session after its submission, the 1951 act, which was not approved until April 19, 1951, could not have been included in the report, and therefore was improperly included in the 1952 Code. But this argument overlooks the further provision in Article VI, Section 5, whereby the laws as compiled in the Code Commissioner's report may, between the time of its submission and the time of its adoption as the Code of Laws, be altered or added to "by Bill passed under the formalities heretofore prescribed for the passage of laws". The purport of Article VI, Section 5 was clearly explained in the concurring opinion of Chief Justice Gary in *Nexsen v. Ward, supra,* from which we quote [96 S. C. 313, 80 S. E. 607].

"The duty imposed upon the Code Commissioner to reduce into a systematic Code the general statutes with all the amendments thereto, and report the result of his labors to the General Assembly, shows that the framers of the Constitution contemplated that his report would embody, as far as possible, all the general statutory law of the state; but they realized that errors would be made, and that it would be necessary to make alterations and additions to the laws contained in the report of the commissioner. They therefore, provided the manner in which the alterations or additions should be effected, towit: By bill passed under the formalities prescribed for the passage of other laws. The report is required to be placed upon the desks of the members of the Legislature, and cannot be taken up for consideration until the next session thereafter. The Constitution requires these things to be done, in order that the members of the Legislature may have ample time for ascertaining the necessary alterations and additions; and, in order that the alterations and additions may not then be made, without due consideration, it is provided that the report shall not be amended as an ordinary act, but that alterations or additions

could only be made in the most formal manner for the passage of statutes.

"When all these steps were taken, then it was intended that the report of the commissioner should be declared, by an act of the Legislature to be the only general statutory law of the state, so as to enable any person to ascertain the general statutory law of the state, without being compelled to search beyond the Code of Laws then of force, and the statutes subsequently enacted.

"This construction gives effect to all the provisions of said section, and any other construction would defeat the great change which was intended to be made by the Constitution, in the codification of the General Statutes.

"Furthermore, the word 'therein,' in the provision that 'no alterations or additions to the laws therein contained shall be made,' etc., has reference to the report of the commissioner, and not to the general statutory law of the state, to be found elsewhere than in the said report. That report was denominated a 'Code,' and it was this 'Code' that the General Assembly was required to declare to be the only general statutory law of the state, after such alterations or additions as it might see fit to make."

Section 96 of Article I of the 1951 act, being general, not local, legislation, and having been declared by its express terms to be a part of the permanent laws of the state, was an addition, within the purview of Article VI, Section 5 of the Constitution, to the general statutory law as contained in the Code Commissioner's report. It was therefore entitled to inclusion in the 1952 Code; and its inclusion therein was, moreover, expressly directed by the General Assembly in Section 10 of Act No. 380 of 1951 (Act May 1, 1951, XLVII Stat. at L. 724). Thereafter, by act approved November 19, 1952 (XLVIII Stat. at L. 2), the report of the Code Commissioner made to the General Assembly for the year 1951, "with the addition of the general and permanent provisions enacted during 1951", was adopted as the Code of Laws of South Carolina 1952.

We conclude, therefore, that the provisions of the 1951 act before mentioned were duly incorporated into the 1952 Code, and that the deficiency that had existed in the title of that act prior to the codification of that section of it thereupon became of no consequence.

Respondent suggests, by way of "additional sustaining grounds", that the license tax provisions of both the 1950 and the 1951 acts, as construed by the tax commission, would violate the due process and equal protection clauses. It contends that to include in the calculation of investment income, as the basis for the tax, income from "foreign" securities would be unfairly to discriminate against domestic, and in favor of foreign, insurance companies, because of the latter's immunity from taxation as to such intangibles held by them outside of the state; and further that, as between domestic insurance companies, the amount of the tax would vary with the character of their investments. But variance of the tax burden resulting from situs of the property that is the source of the investment income upon which the tax is to be calculated would not of itself warrant the conclusion of unconstitutionality. The mandates of due process and equal protection do not require exact equality in such taxation. An act of the General Assembly is entitled to every presumption in favor of its constitutionality, *Santee Mills v. Query,* 122 S. C. 158, 115 S. E. 202; and before a tax statute will be stricken down as violative of the constitutional provisions just mentioned it must be made to appear to the court that the classification expressed in or resulting from its terms is palpably arbitrary, capricious or unreasonable. *Marshall v. South Carolina Tax Commission,* 178 S. C. 57, 182 S. E. 96, certiorari denied, 296 U. S. 585, 56 S. Ct. 96, 80 L. Ed. 413; *Ponder v. City of Greenville,* 196 S. C. 79, 12 S. E. (2d) 851; *Prudential Insurance Co. of America v. Murphy,* 207 S. C. 324, 35 S. E. (2d) 586; affirmed *Prudential Insurance Co. v. Benjamin,* 328 U. S. 408, 66 S. Ct. 1142, 90 L. Ed. 1342, 164 A. L. R. 476. No such showing is made here.

The constitutional issues raised by respondent's "additional sustaining grounds" having been thus considered and disposed of, we come to the interpretation of the statute. Under the well-established rule of construction, it is not to be extended beyond the clear import of its language, and any substantial doubt as to its meaning is to be resolved in favor of the taxpayer. *Hadden v. South Carolina Tax Commission,* 183 S. C. 38, 190 S. E. 249; *Beard v. South Carolina Tax Commission,* 230 S. C. 357, 95 S. E. (2d) 628. On the other hand, if the legislative intent is clearly apparent from the language of the statute, there is no occasion for resort to the rule of statutory construction. *Crescent Manufacturing Co. v. South Carolina Tax Commission,* 129 S. C. 480, 124 S. E. 761.

The controversy here centers upon the language of the statute (Code 1952, Section 65-932) defining "investment income" as including "all money or income received on account of ownership in or use of real or personal property situated within the State * * *". Respondent argues that the words "personal property" as here used mean only tangible personal property, and do not include intangibles such as shares or deposits in building and loan associations, or municipal bonds. But there is certainly nothing in the language of the statute indicating that the legislature intended to so limit the meaning of "personal property". On the contrary, the provision excepting from investment income to which the tax is applicable "income arising from (a) premiums paid for an insurance contract; (b) mortgage loans; (c) policy loans, or (d) bonds or securities of the State and its political subdivisions" would seem clearly to imply legislative intent that the tax should apply to other intangibles not so excepted. We note, also, that the record before us contains no suggestion of any "tangible" personal property from which respondent or other insurance companies subject to the tax in question derive income.

The term "personal property", in its broadest legal significance, includes all property that is not real property. Vol. 32 Words and Phrases, Personal Property, pp. 480 *et seq.; Rikard v. Miller,* 231 S. C. 98, 97 S. E. (2d) 257. Its meaning may, of course, be restricted where such intention is apparent from the context or otherwise, *Quick v. Owens,* 198 S. C. 29, 15 S. E. (2d) 837, 137 A. L. R. 201; *Rikard v. Miller, supra;* but such does not appear to be the case here.

If, therefore, the statute intended, as we think it did, to include in the term "personal property" shares or deposits in building and loan associations, and municipal bonds, is such property, in the ownership of respondent, a domestic corporation, "situated within the State"? Although the tax imposed by the statute is designated a license, not an income, tax, it is in fact calculated upon the income from intangibles having a taxable situs only at the domicile of their owner, *Fuller v. South Carolina Tax Commission,* 128 S. C. 14, 121 S. E. 478; *Beidler v. South Carolina Tax Commission,* 162 S. C. 447, 160 S. E. 264. It seems only realistic to conclude that "situated" as here used refers to taxable situs rather than to physical location. The words "situated" and "lying and being" in statutes relating to taxation of personal property, tangible and intangible, has been so construed in other jurisdictions. For example, in *Brock v. Board of Sup'rs of Los Angeles County,* 1937, 8 Cal. (2d) 286, 65 P. (2d) 791, 110 A. L. R. 700, where a portion of a jeweler's stock was, on the tax day, out of the state and at a place to which it had been taken for the purpose of display and possible sale, it was held that its taxation in Los Angeles county was not precluded by the provision in the tax statute that all taxable property shall be assessed in the county, city or district in which it is "situated", Pol. Code, § 3628, West's Ann. Rev. & Tax. Code, § 404. *Assessors of Sheffield v. J. F. White Contracting Co.,* 1955, 333 Mass. 306, 130 N. E. 696, 698, involved a tax assessed by the town of Sheffield, Mass., upon machinery belonging to the

contracting company, a domestic corporation having its principal place of business in Cambridge, Mass. On January 1, 1953, when the tax was assessed, the machinery in question was physically in the town of Sheffield, where it was in use on a construction job in which the contracting company was then engaged. The statute authorized the assessment of a tax on machinery used in the conduct of the business of a domestic business corporation "where such machinery * * * is situated * * *". M. G. L. A. c. 59, § 18, subd. 2. The court, ordering abatement of the tax, said: "The term 'situated,' as used in the statute, has, we think, the same meaning as 'situs,' a term which perhaps is used more frequently in tax statutes". And in *First Trust Joint Stock Land Bank of Chicago v. City of Dallas,* Tex. Civ. App. 1942, 167 S. W. (2d) 783, 786, the court, considering the question of whether the city of Dallas had power to tax shares of stock of a joint stock land bank under the authority of the city's charter, which empowered it to tax "all property, real, personal or mixed, lying and being within the corporate limits of the City of Dallas," declared: "The phrase 'lying and being within the corporate limits of the City of Dallas,' obviously refers to the taxable situs of personal property".

It is suggested in argument for the respondent that in our consideration of the tax commission's present contention that the tax is applicable to income received from the intangibles in question we should give weight to the fact that it was not until January, 1955, that the commission ruled that the tax was so applicable; and that for the years 1950 through 1954 it accepted without objection returns made by domestic insurance companies in which such income was not included. While such acquiescence during those four years is entitled to weight, we think it was erroneous; it does not preclude correction by either the commission or the courts. *Fennell v. South Carolina Tax Commission,* S. C., 103 S. E. (2d) 424, opinion filed May 13, 1958.

Finally, respondent argues that even though the tax be applicable to income from tangibles it is not applicable to income received from ownership of deposits and shares in building and loan associations, because such income arises from "mortgage loans" within the meaning of the exception of the statute. We think this contention untenable. It disregards the context, from which it is apparent, in our opinion, that the "mortgage loans" intended to be excepted from the operation of the statute are loans made by the insurance companies themselves.

Section 96 of Article I of the 1951 Act having been invalid until its incorporation, in 1952, into the 1952 Code of Laws, assessment of license taxes thereunder for the year 1951 was improper, and respondent is entitled to refund of the amount of such license tax and interest thereon as it paid for that year. It is not entitled to interest on the amount so paid by it, there being no statute permitting recovery of interest in such cases. *Monarch Mills v. South Carolina Tax Commission,* 149 S. C. 219, 146 S. E. 870.

Affirmed in part and reversed in part.

STUKES, C. J., and TAYLOR, OXNER, and MOSS, JJ., concur.