15428

GREENVILLE BASEBALL, INC., v. BEARDEN, SHERIFF, *ET AL*

(20 S. E. (2d), 813)

*Messrs. Wyche, Burgess* and *Wofford,* counsel for petitioner,

*Mr. Wilton H. Earle,* of Greenville, counsel for respondents,

June 12, 1942.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE FISHBURNE:

At the 1941 session of the General Assembly the following Act was passed (Acts 1941, 42 St. at Large, page 307):

"Section 1: * * * For a period of two years after the effective date of this Act, it shall be lawful to exhibit publicly motion pictures, athletic sports and musical concerts and to engage therein from and after two p. m., òn Sunday in counties wherein the United States Government *has established and maintains permanent or temporary Army Forts, Naval or Marine bases;* Provided, that the exhibition of such motion pictures and engagements in athletic sports is lawful on other week days. Provided, however, that the theatre operator shall first obtain from the town or city council a special permit to run his theatre on Sunday. The terms of this Act shall in no way conflict with any Sunday evening church service.

"Section 2: Repeal.—All laws or parts of laws in anywise inconsistent herewith are hereby repealed." (Emphasis added.)

The primary question for determination presented in this action, which by permission was instituted in the original jurisdiction of this Court, is whether an army *air* base comes within the purview of the statute. The specific issue has to do with the air base located at Greenville. The plaintiff seeks injunctive relief restraining the sheriff of Greenville County and his duly authorized deputies from in any manner pro-

hibiting or interfering with the plaintiff in the exhibition of baseball games for public amusement in Greenville County after two o'clock p. m., on Sundays, and from arresting plaintiff's employees, baseball players and baseball umpires engaged in and officiating at such baseball games. Under the order of this Court a temporary restraining order was issued pending the final decision of the case.

For the purpose of deciding the legal issue, we will assume for the present that the army air base at Greenville has been established and is now being maintained by the United States Government. Whether it has been established and is being maintained will be discussed later in this opinion.

It appears that on Sunday afternoon, April 26, 1942, in Greenville, a baseball game was commenced between a team of the plaintiff and a team from Macon, Georgia, both teams being members of the South Atlantic League. The sheriff of Greenville County and his deputies stopped the game, and arrested the umpires upon a charge of violating Section 1733 of the 1932 Code. It is alleged and is admitted that the sheriff has threatened and intends to stop all future games played on Sunday, and to arrest those participating therein. The plaintiff sets forth that unless the sheriff and his deputies are restrained, it will suffer irreparable property loss and damage; and that the steps threatened by the respondents if carried into execution will involve numerous lawsuits, will result in a mutiplicity of successive prosecutions, and will effectually deprive the plaintiff of its property and property rights without due process of law.

It is contended by the plaintiff that Section 1733, under which the respondents acted, has been repealed by the Act of 1941, and is clearly void in the County of Greenville. Section 1733 prescribes and prohibits public sports in this State on Sunday, and a violation of the statute is made a misdemeanor.

The respondents take the position that the Act of 1941 should be given a literal and narrow construction. They say that an army "fort" does not include an army "air base."

It often happens that the true intention of the legislature, though obvious, is not expressed by the language employed in a·statute when that language is given its literal meaning. In such cases, the carrying out of the legislative intention, which is the prime and sole object of all rules of construction, can be accomplished only by departure from the literal interpretation of the language used. Hence, Courts are not always confined to the literal meaning of a statute; the real purpose and intent of the lawmakers will prevail over the literal import of the words. *Woodward v. State Rural Electrification Authority,* 190 S. C., 465, 3 S. E. (2d), 539; *Mills v. Southern R. Co.,* 82 S. C., 242, 64 S. E., 238; *State ex rel. Walker v. Sawyer,* 104 S. C., 342, 88 S. E., 894; *State v. Firemen's Insurance Company of Newark, N. J.,* 164 S. C., 313, 162 S. E., 334.

Modern authorities generally favor the interpretation of statutes according to the natural and obvious signification fo the wording, without resort to subtle and refined construction for the purpose either of limiting or extending their operation. And Courts will reject the ordinary meaning of the words used in a statute however plain it may be, when to accept such meaning would defeat the plain legislative intent. *Bruner v. Smith,* 188 S. C., 75, 198 S. E., 184, 25 R. C. L., 962; *Carter v. Barnes,* 87 S. C., 102, 68 S. E., 1054; *Stackhouse v. Board of Com'rs for Dillon County,* 86 S. C., 419, 68 S. E., 561. A statute as a whole must receive a practical, reasonable and fair interpretation consonant with the purpose, design and policy of the lawmakers. And the history of the period in which the Act was passed may be considered., *Weston v. Board of Com'rs of Police Insurance and Annuity Fund,* 196 S. C., 491, 13 S. E. (2d), 600; *Windham v. Pace,* 192 S. C., 271, 6 S. E. (2d), 270.

It is a familiar canon of construction that a thing which is in the intention of the makers of a statute is as much within the statute as if it were within the letter. It is also an old and well-established rule that words

ought to be subservient to the intent, and not the intent to the words.

It is argued that the army air base at Greenville does not justify the application and operation of the Act in Greenville County, because an army "air base" does not come literally within the wording of the 1941 Act. In our opinion, however, an army air base does plainly come within the intent, purpose, spirit and design of the Act.

When the 1941 statute was adopted by the legislature, the Congress of the United States had passed the Selective Service Act, 50 U. S. C. A. Appendix § 301 *et seq.,* which called to the colors millions of young men. The Act was passed to meet the grave emergency which then and now confronts this nation. The United States Government by virtue of the Selective Service Act embarked upon a vast undertaking, all of which was well known to the General Assembly of this State —the organization and training of an armed force of tremendous proportions. Upon induction into the service, these men were assigned and are still being assigned to the army, the navy, the marine corps, the air corps, and other branches of the service too numerous to mention. Training centers were established by the Federal Government in practically every state in the union. These centers are designated as forts, camps, naval and marine bases, air fields, airports, air bases, and words of like import and terminology. But regardless of name or particular designation, these centers are places generally devoted to the garrison and training of men in the art and science of modern warfare—whether they be soldiers, sailors, marines, air pilots or bombardiers.

We have in South Carolina several of these training centers, of which the Court takes judicial notice; Fort Jackson, formerly Camp Jackson, near Columbia; Camp Croft, at Spartanburg; the Marine and Naval Bases at Charleston and Parris Island; Air Bases in Richland and Sumter Counties. We may safely assume that the legislature was fully cognizant of the history and conditions of the time, and that the 1941 Act was passed in the light of

a realistic situation. The lawmakers were obviously confronted with the problem of legally allowing to the thousands of troops at all training centers reasonable recreation and diversion on Sunday afternoons—relaxation from the hard and contiuous work of their daily routine.

To construe the Act as contended for by the respondents woud do violence to the evident intention of the General Assembly. We would have to hold that the lawmakers were more concerned with the recreational welfare of the troops at *Fort* Jackson than they were with the soldiers at *Camp* Croft, and that they completely ignored the exact similarity of situation and condition of those men undergoing training in aviation at the army *air bases* in Sumter and Richland County. If those in authority should tomorrow change the designation of Fort Jackson, to Camp Jackson then to be logical, in accordance with the contention of respondents, the thousands of soldiers now at Fort Jackson would *ipso facto* be prevented from attending athletic sports on Sunday in Richland County, because the mere change of name would take Richland County out of the operation of the Act.

It was held in the case of *Hull v. Hull,* 2 Strob. Eq., 174, 21 S. C. Eq., 175:

"Where the words of a Statute, in their primary meaning, do not expressly embrace the case before the Court, and there is nothing in the context to attach a different meaning to them, capable of expressly embracing it; the Court cannot extend the Statute, by construction, to that case, *unless it falls so clearly within the reasons of the enactment as to warrant the assumption that it was not specifically enumerated among those described by the Legislature, only because it may have been deemed unnecessary to do so.* [Emphasis added.]

"Where the general intention of the Statute embraces the specific case, though it be not enumerated, the Statute may, nevertheless, be applied to it by an equitable construction, in promotion of the evident design of the Legislature. But where this is done, it is always presupposed that such a

case was within their general contemplation, or purview, when the Statute was enacted by them; for if the case be omitted in the Statute because not foreseen or contemplated, it is a *causus omissus*, and the Court, having no legislative power, cannot supply the defects of the enactment."

It seems to us too clear for argument that the present case falls clearly within the reasons of the enactment and warrants the assumption that an army "air base" was not specifically enumerated only because the lawmakers deemed it unnecessary. By an equitable construction, "air base" must be deemed included, although not enumerated, in promotion of the evident design and purpose of the legislature.

Included in the record and attached to the return of the respondents are affidavits from several State Senators who were members of the State Senate when the Act of 1941 was adopted, which purport to show the construction placed by them upon the Bill in the course of its passage.

It is a settled principle in the interpretation of statutes that even where there is some ambiguity or uncertainty in the language used, resort cannot be had to the opinions of legislators or of others concerned in the enactment of the law, for the purpose of ascertaining the intent of the legislature. *Tallevast v. Kaminski,* 146 S. C., 225, 143 S. E., 796.

Another question presented by the respondents, a discussion of which we deferred, is that the Greenville Air Base is not yet *established* or *maintained* in Greenville County. It will be recalled that the 1941 statute uses the words, "established and maintains permanent or temporary Army Forts," etc. It is admitted that the United States Government is in the actual possession of approximately 2,800 acres of land located about five miles south of the City of Greenville, which was obtained for it as a site for an army air base, by the City and the County of Greenville. Affidavits attached to the respondents' return show that all negotiations with respect to a proposed lease of this property for an army air base have been entered into between the government on the one

hand and the city and the county on the other. It is further shown that approximately $314,000.00 out of a total of $418,000.00 has been expended in the purchase of the property, and it is agreed that the property will be leased to the government pursuant to said negotiations, although the formal lease has not yet been executed. According to these affidavits, the construction of the air base is about sixty to seventy-five per cent. completed.

It is undisputed that there are now at the Greenville Army Air Base five or six army officers of the Engineering Department of the United States Government, 475 federal employees, including inspectors, motor maintenance personnel, etc., and in addition to these, between three and four thousand contractors' employees engaged in the construction of buildings, runways, etc. About 200 buildings have been constructed, or are in process of construction, on the air base area, consisting of warehouses, barracks, offices, hospital wards, hangars, etc..; and the housing facilities, when completed, will be sufficient for approximately four thousand officers and men. But at this time there are no officers, men or equipment of the Army Air Corps on the site. There are no army airplanes; nor could they be accommodated because the runways and other facilities are not yet completed.

From the standpoint of whether the air base has been established, we think it immaterial that the formal lease of the property has not yet been signed. Unquestionably, the air base site has been established and the air base project is nearing completion. But under the recited facts, we are unable to say, in the light of the 1941 Act, that the Greenville Army Air Base has yet been established and is being maintained as an air base. We do not think that it is, and for this reason alone a permanent injunction will not be issued at this time as prayed for in the complaint. Therefore, the temporary restraining order heretofore issued is vacated and discharged.

Contrary to the contention of the respondents, we are of the opinion that the paintiff lacked an adequate remedy at law, and was warranted in bringing this suit in the Court of equity.

Injunction denied.

MR. CHIEF JUSTICE BONHAM, MR. ASSOCIATE JUSTICE STUKES, and CIRCUIT JUDGES PHILIP H. STOLL and E. H. HENDERSON, ACTING ASSOCIATE JUSTICES, concur.