549 S.E.2d 243

Glenn E. **KENNEDY**, Charles Wolfe, Terry Knighton, and Jerry Landford, Individually and on Behalf of a Class of Persons Similarly Situated, Appellants,

v.

The SOUTH CAROLINA RETIREMENT SYSTEM and the South Carolina Budget and Control Board, Respondents.

No. 25133.

Supreme Court of South Carolina.

Reheard Dec. 5, 2000.

Refiled May 22, 2001.

Rehearing Denied July 30, 2001.

340

Michael Eugene Spears, of Spartanburg, for appellant.

Stephen Van Camp, of South Carolina Retirement System, of Columbia; and R. Kent Porth and Elizabeth H. Campbell, both of Nexsen Pruet, Jacobs & Pollard, of Columbia, for Respondent South Carolina Retirement System. Joseph D. Shine and Edwin E. Evans, both of State Budget and Control Board, of Columbia, for Respondent State Budget and Control Board. Richard Mark Gergel and W. Allen Nickles, both of Gergel, Nickles & Solomon, of Columbia, for Respondents. Lesley A. Bowers, of Columbia, for Amicus Curiae, Protection and Advocacy for People With Disabilities, Inc. Mary J. Bradwater, of Columbia, for Amicus Curiae, The South Carolina School Boards Association. Edwin Johnson, II, of McNair Law Firm, of Columbia, for Amicus Curiae, The South Carolina Chamber of Commerce. Deena Smith McRackan, of Charleston, for Amici Curiae, The South Carolina Education Association and The South Carolina Education Association–Retired. Vance J. Bettis, of Gignilliat, Savitz & Bettis, of Columbia, for Amicus Curiae, The South Carolina State Employees Association, for respondents. Richard J. Breibart, of Lexington, for Amicus Curiae, The Fraternal Order of Police. Ray E. Chandler, of Coffey Chandler & Johnson, of Manning, for Amicus Curiae the South Carolina State Fireman's Association. Scott T. Price, of Columbia, for Amicus Curiae the South Carolina School Boards Association.

TOAL, Chief Justice:

Four retired state employees ("the Employees") brought suit against the South Carolina Retirement System and the South Carolina Budget and Control Board (collectively "the Retirement System") claiming their retirement benefits have been miscalculated. The trial court ruled in favor of the Retirement System and the Employees have appealed.

### FACTUAL/PROCEDURAL BACKGROUND

In 1986, the General Assembly amended S.C.Code Ann. § 9–1–10(17) (Supp.1998) of the South Carolina Retirement System.[1] This statute provides the definition of "average final compensation" for a retiring state employee. Average final compensation is one element used in the Retirement System Act to calculate the monthly retirement benefits of a state employee. *See* S.C.Code Ann. § 9–1–1550(B)(1) (Supp.1999).[2] The dispute in this case is over the 1986 amendment's effect on the calculation of the average final compensation of an employee with respect to the value of unused annual leave.

Before 1978, the Retirement System gave a retiring employee credit for all accrued unused annual leave when calculating the average final compensation for retirement benefits. The statutory section read:

> (17) "Average final compensation" with respect to those members retiring on or after July 1, 1970, shall mean the average annual earnable compensation of a member during the three consecutive fiscal years of his creditable service producing the highest average.

Under this statute and its predecessors going back to the creation of the system in 1945, the Retirement System, as a matter of policy, gave credit for unused annual leave even though there was no specific requirement in the statutory section that it do so. Furthermore, there was no limit on the amount of accrued annual leave for which an employee could receive credit.

---

1. The General Assembly also amended S.C.Code Ann. § 9–11–10(14) (Supp.1998) involving the Police Officer Retirement System. The issues regarding that amendment are identical to the issues regarding the amendment of section 9–1–10(17). To avoid redundancy, we only discuss the amendment's effect on section 9–1–10(17) and will address the issues in terms of that statute. There are no significant differences between the two sections and our decision applies equally to each provision.

2. The formula provided in this section is:

.0182 x "Average Final Compensation" x Years of Service = Annual Retirement Allowance

In 1978, the General Assembly amended the section and addressed unused annual leave for the first time. After the 1978 amendment, the section read:

(17) "Average final compensation" with respect to those members retiring on or after July 1, 1970, shall mean the average annual earnable compensation of a member during the three consecutive fiscal years of his creditable service producing the highest such average; *an amount up to and including forty-five days termination pay for unused annual leave may be added to the pay period immediately prior to retirement and included in the average as applicable.*[3]

The 1978 amendment had two major effects on the use of unused annual leave in the average final compensation calculation. First, the amendment placed a forty-five day cap on the amount of unused annual leave for which an employee could receive credit. Second, the unused annual leave could only be calculated in the average final compensation equation if the pay period immediately prior to the employee's retirement was one of the three highest in the employee's career. As a consequence of this second restriction, employees would regularly have to retire on the last day of their last fiscal year to ensure that any unused annual leave would be included in the calculation. Servicing a large volume of retirement claims at one time created an administrative problem for the Retirement System.

In 1986, the General Assembly amended section 9–1–10(17) to read as follows:

(17) "Average final compensation" with respect to those members retiring on or after July 1, 1986, means the average annual earnable compensation of a member during the twelve consecutive quarters of his creditable service on which regular contributions as a member were made to the System producing the highest such average; **a quarter means a period January through March, April through June, July through September, or October through December.** An amount up to and including forty-five days'

---

3. The bold type indicates the language added to the section.

termination pay for unused annual leave **at retirement** may
be added to the **average final compensation**.... [4]

Both sides in this matter agree that the General Assembly
intended to alter the calculation of average final compensation.
The dispute in this case is over the nature of the change in
unused annual leave benefits.

The parties disagree about whether the amendment
changed the method of adding any unused annual leave to the
average final compensation equation. Before the 1986 amend-
ment, it is undisputed that the value of the unused annual
leave was added *into* the average final compensation equation
*before* the total was averaged. After the amendment, the
Employees claim the value of the unused annual leave should
be added *to* the average final compensation equation *after* the
average has been taken. The Retirement System's position is
that the unused annual leave should still be added *into* the
average final compensation equation *before* the average is
taken.

The Employees filed suit against the Retirement System in
November 1995, seeking a declaratory judgment as to the
meaning of section 9–1–10(17). The trial court noted that
section 9–1–10(17), defining average compensation, does not
contain the provisions for the payment or calculation of retire-
ment benefits to the employee. The payment and benefit
calculation provisions are contained in section 9–1–1550. Ana-
lyzing this relationship, the trial court found "harmony of
these provisions is critical in the calculation of a retiree's
monthly benefit." The trial court then noted that the 1986
amendment dividing the definition of average final compensa-
tion into two separate sentences, where it had previously been
only one, added confusion to the process. The trial court
determined that the first sentence of section 9–1–10(17) alone
was the definition of average final compensation. The trial
court then found that the second sentence discussing the
addition of unused annual leave to the first sentence's defini-
tion of average final compensation produced a new number
that the Employees called "total final compensation." The
trial court determined that this new "total final compensation"
number was not referenced in section 9–1–1550 so there

---

4. The bold type indicates the new language.

existed an ambiguity about how the General Assembly intended to compute average final compensation in relation to the unused annual leave.

The trial court then looked to the rules of statutory construction to determine the intent of the General Assembly in regards to the calculation of average final compensation. First, the trial court analyzed what it determined to be the legislative history of the 1986 amendment. The trial court also looked at the Retirement System's statutory scheme as a whole. The trial court gave deference to the interpretation of the statute by the Retirement System. Furthermore, the trial court determined that the use of the word "may" in reference to the addition of unused time to the average final compensation resulted in total discretion on the part of the Retirement System as to whether any unused annual leave would be added into the equation. Finally, the trial court found that even if the Employees were correct in their interpretation, S.C. Const. art X, § 16 prevented them from recovering the requested relief.

LAW/ANALYSIS

## I. Section 9–1–10(17) is Ambiguous

The first question of statutory interpretation is whether the statute's meaning is clear on its face. "If a statute's language is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the court has no right to look for or impose another meaning." *Paschal v. State Election Comm'n*, 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995). We find the language of section 9–1–10(17) is ambiguous on its face because it is unclear at what point the General Assembly intended the unused annual leave to be added in the average final compensation equation.

The section can be read, as the Employees argue, that up to 45 days are added to the equation **after** the average is taken. The section can also be read as the Retirement System argues, adding up to 45 days of unused annual leave to the average final compensation equation **before** taking the average of the 12 highest quarters. The use of the phrase "average final compensation" in the section that defines "aver-

age final compensation" is confusing. Also, ambiguity arises from the General Assembly's use of the phrase "added to." In a statute, the word "to" can be read as a word of either inclusion or exclusion depending on the intent of the General Assembly. BLACK'S LAW DICTIONARY 1487 (6th ed.1990).[5] The plain language of the section fails to reveal the General Assembly's intention with regard to the meaning of "added to." [6]

---

[5] "**To.** While this is ordinarily a word of exclusion, when used in describing premises, it has been held that the word in a statute may be interpreted as exclusionary or inclusionary depending on the legislative intent as drawn from the whole statute. *Clark v. Bunnell*, 172 Colo. 32, 470 P.2d 42, 44 (1970). It may be a word of inclusion, and may also mean 'into.' "

[6] Plaintiff Wolfe's unused annual leave had a value of $5,875. Under the Retirement System's approach, Wolfe's average final compensation would be calculated as follows:

$$\frac{\$96,190 \text{ (the total of his 12 highest quarters)} + \$5,875}{3} = \mathbf{\$34,022}$$

As a retired police officer, Wolfe's average final compensation would then be put into section 9-11-60 (.0214 x "Average Final Compensation" x Years of Service = Annual Retirement Allowance)

.0214 x $34,022 x 30 = $21,842.13 (Annual Retirement Allowance)

$21,842.13 / 12 = $1,820.18 (monthly benefits payment to Wolfe)

Under the Employees approach, Wolfe's average final compensation would be calculated as:

$$\frac{\$96,190 \text{ (the total of his 12 highest quarters)}}{3} = \$32,064 + \$5,875 = \mathbf{\$37,939}$$

Put into section 9-11-60:

.0214 x $37,939 x 30 = $24,356.84 (Annual Retirement Allowance)

$24,356.84 / 12 = $2,029.74 (monthly benefits payment to Wolfe)

$2,029.74 - Monthly Payment Under Employee's approach
$1,820.18 - Monthly Payment Under Retirement System's approach
$  209.56   Difference Between Methods

Therefore, since the plain language of the statute lends itself to two equally logical interpretations, this Court must apply the rules of statutory interpretation to resolve the ambiguity and to discover the intent of the General Assembly. Where the language of an act gives rise to doubt or uncertainty as to legislative intent, the construing court may search for that intent beyond the borders of the act itself. *The Lite House, Inc. v. J.C. Roy, Co.*, 309 S.C. 50, 53, 419 S.E.2d 817, 819 (Ct.App.1992).[7] When looking beyond the language of section 9–1–10(17) and comparing this section with the overall structure of the South Carolina State Retirement System, we find the General Assembly intended the 45 days of unused annual leave to be added to the computation **before** taking the average of the 12 highest quarters.

The most powerful indication of legislative intent is the lack of legislative history and debate which accompanied the adoption of section 9–1–10(17).[8] If section 9–1–10(17) is interpreted to mean the unused leave is added **after** the average is taken, a dramatic increase in benefits will result. In effect, this interpretation would increase the dollar value for unused annual leave three fold,[9] and would allow members to retire with benefits calculated on an "average" salary which is greater than any salary they earned during employment. The Retirement System's consulting actuary testified the actuarial

---

7. Although the court may look beyond the borders of the act itself, the trial court erred in relying heavily on the testimony of Purvis Collins to determine legislative intent. Under South Carolina law, neither a drafter nor a legislator can testify as to legislative intent. *Greenville Baseball, Inc. v. Bearden*, 200 S.C. 363, 20 S.E.2d 813 (1942).

8. Contrary to the dissent's assertion, this Court has used the lack of legislative history as a factor in interpreting a *statute*. *See Robertson v. State*, 276 S.C. 356, 278 S.E.2d 770 (1981) (wherein we concluded, after a review of a statute's legislative history which revealed no specific reason for a change in its wording, that the legislature did not intend the change to affect substantial rights); *see also Chestnut v. South Carolina Farm Bureau Mut. Ins. Co.*, 298 S.C. 151, 378 S.E.2d 613 (Ct.App.1989). As in *Robertson*, there is nothing in the legislative history surrounding the enactment of section 9–1–10(17) which would indicate the legislature intended to dramatically effect the calculation of retirement benefits.

9. For example, plaintiff Wolfe's monthly benefits increase by $209.45 per month under this interpretation.

present value of the unfunded liability created by the Employees' interpretation is $1.177 billion dollars.[10] Therefore, had the legislature intended the statute to be applied as argued by the Employees, they would have been dramatically increasing the payments to retirees.

If the General Assembly intended to add the leave **after** the average was taken, it is reasonable to assume the history and circumstances surrounding the amendment would indicate the General Assembly intended to increase benefits, thereby adding $1.177 billion in liability to the State Retirement System. The history in no way indicates the legislature intended to make such a dramatic increase in benefits. First, the title of the 1986 Appropriations Act, which included the amendment to section 9–1–10, did not reference an increase in benefits.[11] *See Ex Parte Georgetown County Water & Sewer Dist.*, 284 S.C. 466, 468–69, 327 S.E.2d 654, 656 (1985) ("The purpose of Article III, § 17 is to prevent the General Assembly from being misled into the passage of bills containing provisions not indicated in their titles.") The title to the 1986 Appropriations Act provides, in relevant part:

To amend sections 9–1–10 and 9–11–10 of the 1976 Code, relating to the South Carolina Retirement System and the

---

10. The actuary arrived at this figure by determining the funding required to pay the increase in benefits for current retirees, and the funding required to pay the increase in benefits for current employees who may retire. The actuary calculated the liability based on employees retiring in the future with an average of 22.5 days of unused annual leave. However, if the Employees' interpretation stands, retiring employees will have a great incentive to retire with the full 45 days, and therefore the estimated $1.177 billion liability might well be much greater. The Employees do not present their own actuary, or dispute the Retirement System's actuary. They simply argue the Court should only look at the amount of money it would take to pay the current litigants, since future retirees are not before this Court. The Employees' argument is without merit. The statute, and therefore the Court's interpretation of the statute, applies not only to the Employees as plaintiffs in this case, but also to all state employees who have retired and who will retire in the future.

11. The dissent argues the title of a bill has never been a factor in determining legislative intent. In interpreting a statute in *Whetstone v. South Carolina Dep't of Highways and Pub. Transp.*, 272 S.C. 324, 327, 252 S.E.2d 35, 37 (1979), this Court stated its interpretation was supported by the "... underlying legislative history as exemplified by the original title of the pre-codified Act."

South Carolina Police Officers Retirement System, so as to change the definition of average final compensation from average annual earnable compensation of a member during three consecutive fiscal years to twelve consecutive quarters.

The plain language of the title gives no indication or notice that the amendment would triple the dollar value for unused annual leave.

Secondly, had the General Assembly intended to increase benefits and spend $1.177 billion, it is reasonable to assume they would have engaged in floor debate. They did not.[12] Furthermore, no fiscal impact analysis was undertaken. *See* S.C.Code Ann. § 2–7–72 (Supp.1999) (Bills and resolutions requiring expenditure of funds shall have impact statements).[13] Finally, the legislature did not determine whether the increase would impact the actuarial soundness of the State Retirement System as a whole. While we hold the amendment to section 9–1–10(17) does not violate S.C. Const. art. X, § 16, the fact that the legislature has never funded the increase as required by article X, § 16 is further evidence the legislature did not

---

12. Upon reviewing the Legislative History surrounding the 1986 Appropriations Act, we find no evidence of floor debates, or any meaningful discussion of the amendment to section 9–1–10(17), although there are numerous other debates surrounding the 1986 Appropriations Act. The dissent suggests the lack of debate only means there was little controversy surrounding the amendment's enactment. However, it is hard to imagine, especially in light of the numerous amicus briefs filed in this case, there would have been little debate or controversy had everyone been aware the amendment would mean a dramatic increase in retirement benefits for a defined group.

13. For example, in the same year section 9–1–10(17) was amended, the General Assembly passed House Bill No. 3637, which amended the Police Officers Retirement System so as to include National Guard and Reserve Service in the Retirement calculation. House Bill 3637 was accompanied by a fiscal impact statement. The dissent argues this Court has never used the lack of a fiscal impact statement as a factor in statutory interpretation. Financial bills almost always include an impact statement, and, therefore, this Court has most likely not been confronted with the absence of such a statement in a financial bill. The amendment to section 9–1–10(17), if interpreted as the Employees argue, would add an enormous increased cost to the South Carolina Retirement System. It is far from unreasonable to assume our legislature would have undertaken an impact analysis had they intended to bestow such a great increase in retirement benefits.

intend to bestow such an increase when it amended section 9–1–10(17).

Policy considerations also weigh in favor of the Retirement System's interpretation. It must be assumed the legislature intends to maintain the soundness of the State Retirement System. If the Court accepts the Employees' interpretation, the dramatic increase in liability might render the System unsound. Donald Overholser ("Overholser"), the Retirement System's actuary, testified the interpretation sought by the Employees would make the entire State Retirement System actuarially unsound. Thomas Cavanaugh ("Cavanaugh") of Gabriel, Roeder, Smith & Company also testified the $1.177 billion unfunded liability would leave the System actuarially unsound.[14] Cavanaugh and Overholser were qualified by the court without objection as experts in the field of actuarial valuation. The Employees presented no expert testimony or any testimony to contradict Cavanaugh and Overholser's conclusion. Instead, the Employees claim the Court and the actuaries should only consider the amount of money it would take to pay off their plaintiff class, not the effect of the interpretation on the system as a whole. This position ignores the rule of statutory construction that, absent a change by the legislature, the statute will apply to all state employees who will retire in the future.

Furthermore, we find the Employees' interpretation of the statute, which would have the unused annual leave added after the total is averaged, leads to an absurd result that the Legislature could not have intended. *See Gentry v. Yonce,* 337 S.C. 1, 522 S.E.2d 137, 143 (1999) ("Statutes should not be construed so as to lead to an absurd result."); *Kiriakides v. United Artists Communications, Inc.,* 312 S.C. 271, 440 S.E.2d 364 (1994) (the court should reject a meaning when to accept it would lead to a result so plainly absurd that it could not have been intended by the legislature). We hold the Employees' interpretation of the statute leads to the absurd result of rendering the State Retirement System actuarially unsound.

---

14. This is further evidence of legislative intent to add unused leave before the final average is taken.

As discussed previously, the Retirement System's actuary, Overholser, and Cavanaugh testified that the present value of the unfunded liability created by the Employees' interpretation is $1.177 billion dollars.[15] Overholser further testified the inclusion of an additional unfunded liability of $1.177 billion dollars would increase the unfunded amortization period of the System from nineteen to fifty-five years.[16] The Government Accounting Standards Board mandates that public pension plans' amortization period should not exceed thirty years. On the evidence presented to the trial court, the State Retirement System would become actuarially unsound if this Court adopts the Employees' interpretation. Furthermore, an employer's bond and credit rating can be affected by an amortization period in excess of thirty years, and can impact an employer's ability to borrow.

Construing the statute so as to cause such a devastating impact on the fiscal integrity of the State Retirement System, especially in the absence of any fiscal impact report or meaningful debate from the Legislature, would lead to an absurd result that could not have been intended by the legislature.

## II. The Use of the Term "May" Does Not Grant the Retirement System Unlimited Discretion

■ The Retirement System argues that the use of the phrase "may" in section 9–1–10(17)[17] gives the Retirement System complete discretion as to whether and how to add the unused annual leave. We disagree.

■ The term "may" is used in section 9–1–10(17) to allow the Retirement System to add unused annual leave into an employee's benefits calculation if the employee retires with any unused leave. The use of the word "may" signifies

---

**15.** The dissent argues the unfunded liability number is much lower. Although we find $1.177 billion to be the correct figure, even a quarter of that figure, as suggested by the dissent, would cause dire consequences to the Retirement System.

**16.** The Police Officers Retirement System would increase from a period of seven years to infinity.

**17.** "An amount up to and including forty-five days' termination pay for unused annual leave at retirement may be added to the average final compensation ..."

permission and generally means that the action spoken of is optional or discretionary unless it appears to require that it be given any other meaning in the present statute. *See State v. Wilson*, 274 S.C. 352, 356, 264 S.E.2d 414, 416 (1980). In this section, since it is very common for employees to retire without any accrued annual leave, the use of the word "may" allows the Retirement System to add such leave, if it exists, to the equation.

The construction given to the word "may" by the trial court would result in unfettered discretion by the Retirement System in determining whether to grant or deny credit for unused annual leave. It would allow the Retirement System to treat employees with the same number of unused annual leave days differently. This discretion would be entirely inappropriate in a statute defining retirement benefits computation. Absolute equality of treatment to similarly situated beneficiaries is the hallmark of a qualified defined benefits pension plan. The only reasonable construction of the word "may" is that it allows the Retirement System to include up to 45 days, and no more, in the calculation, if the employee has such unused leave when he retires.

### III. The Testimony of Purvis Collins about Legislative Intent Was Inadmissible

■■ The Employees argue that the trial court erred in admitting the testimony of Purvis Collins and relying on his testimony in construing section 9–1–10(17). We agree.

■■ Purvis Collins, who at the time of this case was retired and is now deceased, was the director of the Retirement System for 24 years. Mr. Collins has been recognized nationally as one of the country's leading governmental retirement system administrators. This Court has the highest respect for Mr. Collins' knowledge, ability, and integrity. Nevertheless, as a matter of law, the testimony of Mr. Collins, an executive branch officer, as the "author" of a legislative amendment, is not admissible as evidence of legislative intent. Not even members of the General Assembly are permitted to so testify. "It is a settled principle in the interpretation of statutes that even where there is some ambiguity or some uncertainty in the language used, *resort cannot be had to the*

*opinions of legislators or of others concerned in the enactment of the law,* for the purpose of ascertaining the intent of the legislature." *Greenville Baseball, Inc. v. Bearden,* 200 S.C. 363, 371, 20 S.E.2d 813, 817 (1942)(emphasis added). In the current matter, the Retirement System claims that Collins' testimony is admissible because it only addressed "problems surrounding the 1978" version of the statute and not the legislative intent. The record does not support the Retirement System's position.

Collins' testimony goes well beyond any limited role claimed for it by the Retirement System. Collins testified extensively about how he drafted the amendment and what he intended the amendment to accomplish. Such testimony of what he intended as "author" of the amendment, as well as what problems he intended the amendment to address, are not proper legislative history for a court to take into account. *See Tallevast v. Kaminski,* 146 S.C. 225, 143 S.E. 796 (1928).

██ Collins' testimony is not completely inadmissible. In his role as the head of the South Carolina Retirement System, Collins' testimony is relevant, although not controlling, to the extent that it discusses how the executive branch interpreted the amendment after its enactment. *See Nucor Steel v. South Carolina Public Serv. Comm'n,* 310 S.C. 539, 426 S.E.2d 319 (1992). For the reasons discussed, we find the executive agency's interpretation does reflect the legislative intent of the section.

In light of our holding, we do not need to address the Employees' claims concerning the class certification and statute of limitations.

## CONCLUSION

Based on the foregoing, we **AFFIRM** in result the decision of the trial court.

MOORE, WALLER and PLEICONES, JJ., concur.

BURNETT, J., concurring in part and dissenting in part in a separate opinion.

BURNETT, Justice (concurring in part and dissenting in part):

I concur with Parts II and III of the majority opinion.[18] However, I respectfully dissent from Part I of the opinion.

The dispute in this case concerns the General Assembly's 1986 amendment to the definition of "average final compensation" for State employee retirement purposes found in South Carolina Code Ann. § 9–1–10(17) (Supp.1999).[19] *See* Act. No. 540, Part II, § 25A, 1986 Acts 4897.[20] More particularly, the dispute concerns the amendment's effect on the calculation of the value of unused annual leave.

Prior to 1978, § 9–1–10(17) defined "average final compensation" as follows:

(17) "Average final compensation" with respect to those members retiring on or after July 1, 1970, shall mean the average annual earnable compensation of a member during the three consecutive fiscal years of his creditable service producing the highest average.

Even though the statute did not refer to accrued unused annual leave, the South Carolina Retirement System credited retiring employees with all accrued unused annual leave when calculating the average final compensation for retirement benefits. There was no limit on the amount of accrued annual leave for which an employee could receive credit.[21]

---

**18.** In addition, I would adhere to the Court's original opinion on the issues of class certification and the statute of limitations. *Kennedy v. South Carolina Retirement Sys.*, 345 S.C. 339, 549 S.E.2d 243 (Sup.Ct. 2000).

**19.** The definition of "average final compensation" now appears at § 9–1–10(4) (Supp.2000).

**20.** The General Assembly also amended a similar provision applicable to the Police Officers' Retirement System. S.C.Code Ann. § 9–11–10(14) (Supp.1999). Like the majority, I will only discuss the effect of the amendment on § 9–1–10(17). My opinion, however, applies equally to § 9–11–10(14). I note the definition of "average final compensation" now appears at § 9–11–10(7) (Supp.2000).

**21.** The Retirement System followed this policy since its inception in 1945.

In 1978, the General Assembly amended § 9–1–10(17), to provide, in relevant part, as follows:

(17) "Average final compensation" with respect to those members retiring on or after July 1, 1970, shall mean the average annual earnable compensation of a member during the three consecutive fiscal years of his creditable service producing the highest such average; **an amount up to and including forty-five days termination pay for unused annual leave may be added to the pay period immediately prior to retirement and included in the average as applicable....** [22]

*See* Act No. 408, 1978 Acts 1295.

The 1978 amendment altered the definition of "average final compensation" by limiting the creditable accrued unused annual leave to forty-five days. In addition, it included the annual leave credit in a retiree's average final compensation only if the pay period immediately prior to retirement was within the employee's three highest consecutive fiscal years. As a result of the 1978 amendment, employees generally retired on the last day of their last fiscal year to ensure receipt of credit for any accrued unused annual leave in their average final compensation. The number of employees who retired at the end of the fiscal year produced administrative difficulties for the Retirement System.

In 1986, the General Assembly again amended the definition of "average final compensation." The 1986 amendment provides:

(17) "Average final compensation" with respect to those members retiring on or after July 1, 1986, means the average annual earnable compensation of a member during the twelve consecutive quarters of his creditable service on which regular contributions as a member were made to the System producing the highest such average; **a quarter means a period January through March, April through June, July through September, or October through December.** An amount up to and including forty-five days' termination pay for unused annual leave **at retirement** may be added to the **average final compensation....** [23]

---

22. The bold type indicates the changes relevant to this discussion.

23. The bold type indicates the changes relevant to this discussion.

The parties agree the 1986 amendment changed the definition of average final compensation by using the average earnable compensation during the twelve highest consecutive quarters, rather than the three highest consecutive years, in calculating average final compensation. This amendment allowed employees to retire at the end of a quarter without losing credit for accrued unused annual leave, instead of at the end of the fiscal year. The amendment alleviated the Retirement System's burden of servicing the bulk of employees who retired at the end of the fiscal year.

The parties disagree, however, as to whether the 1986 amendment also changed the method of including accrued unused annual leave in the average final compensation. The Retirement System asserts the amendment did not change the method. According to the Retirement System, pursuant to the 1986 amendment, the value of any unused annual leave is added to the highest consecutive twelve quarters before averaging to determine the average final compensation. Employees, on the other hand, claim the 1986 amendment provides that the value of any unused annual leave is added to the average final compensation after the average is taken. I agree with Employees.

"[W]here a statute is complete, plain, and unambiguous, legislative intent must be determined from the language of the statute itself." *Charleston County Parents for Public Schools, Inc. v. Moseley*, 343 S.C. 509, 515, 541 S.E.2d 533, 536 (2001). "If a statute's language is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for employing rules of statutory interpretation and the court has no right to look for or impose another meaning." *Paschal v. State Election Comm'n*, 317 S.C. 434, 436, 454 S.E.2d 890, 892 (1995).

In my opinion, § 9–1–10(17) is unambiguous. The statute clearly states the value of up to forty-five days unused annual leave "may be **added to the average** final compensation." (Emphasis added). This language clearly provides that annual leave value is added to the average final compensation, not included in the average. Because § 9–1–10(17) is clear on its face, there is no reason for the court to apply the rules of

statutory construction and "the court has no right to look for or impose another meaning." *Id.*

In any event, even if the language of the 1986 amendment is considered ambiguous, by construing the statute as providing that the value of unused annual leave is included in the average final compensation, it is my opinion the majority misapprehends the legislature's intent. I hold this view for several reasons.

First, a comparison of the language in § 9–1–10(17) before and after the 1986 amendment supports the conclusion that the General Assembly intended to change the method for incorporating unused annual leave in retirement benefits. The 1978 statute specifically provides that unused annual leave may be "added to the pay period immediately prior to retirement and **included in the average** ...". (Emphasis added). The 1986 amendment, instead, states the unused annual leave may be **"added to the average final compensation** ...". (Emphasis added). These obvious textual differences support the conclusion the General Assembly intended to change the method of crediting employees' unused annual leave in the average final compensation. *See Vernon v. Harleysville Mut. Cas. Co.*, 244 S.C. 152, 135 S.E.2d 841 (1964) (it will be presumed in adopting an amendment to a statute that the Legislature intended to make some change in the existing law). If the General Assembly did not intend to change the method of crediting employees with unused annual leave, it could have simply modified the language of the 1978 statute and stated "an amount up to and including forty-five days termination pay for unused annual leave may be added to the highest annual earnable compensation and included in the average." The majority's interpretation of the 1986 amendment renders the significant change to the definition of average final compensation a nullity. *See State ex rel. McLeod v. Montgomery*, 244 S.C. 308, 136 S.E.2d 778 (1964) (in seeking intention of legislature, Court must presume General Assembly intended by its action to accomplish something and not to do a futile thing).

Second, contrary to the majority's assertion, this Court has never considered the *extent* of legislative history and debate on a proposed statutory amendment as a factor in interpreting

an ambiguous statute.[24]  However, if the extent of legislative history and debate were a factor, then the limited amount of floor debate on § 9–1–10 suggests there was little, if any, controversy surrounding its enactment.

Third, this Court has never held that the title of a bill is a factor used in determining *legislative intent* behind a statutory enactment.[25]  Accordingly, the fact that the title to the 1986 Appropriations Act does not mention an increase in retirement benefits does not assist the Court in construing the 1986 amendment.

Instead, South Carolina Constitution Article III, § 17 requires that the title of a legislative act serve as notice of its general subject.[26]  The purpose of this constitutional provision is to prevent the General Assembly from being misled into the passage of bills containing provisions not indicated in their titles and to apprize the citizens of the subject of proposed legislation, thereby giving them an opportunity to be heard. *Hercules, Inc. v. South Carolina Tax Comm'n*, 274 S.C. 137, 262 S.E.2d 45 (1980); *Colonial Life & Accident Ins. Co. v. South Carolina Tax Comm'n*, 233 S.C. 129, 103 S.E.2d 908 (1958), *superseded on other grounds I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 526 S.E.2d 716 (2000).  The Court has repeatedly held that "[t]he title of an act need not be a complete index of its contents.  The constitutional mandate is satisfied where the title states the general subject, and the provisions in the body of the act are germane thereto and

---

24. The majority suggests the Court relied on the lack of legislative history as a factor in interpreting a statute in *Robertson v. State*, 276 S.C. 356, 278 S.E.2d 770 (1981).  In *Robertson*, the Court did not hold the extent of legislative debate is a method of statutory construction. Instead, it stated the legislative history behind the amended statute did not reveal the General Assembly's purpose for the amendment.

25. Contrary to the majority's claim, *Whetstone v. South Carolina Dept. of Highways and Public Transp.*, 272 S.C. 324, 252 S.E.2d 35 (1979), does not hold the title of a bill is used to interpret the meaning of an ambiguous statute.  In *Whetstone*, the Court simply held that the title of the bill supported its previous interpretation of a statute.  The Court did not use the title of the bill to determine legislative intent.

26. "Every Act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title."  S.C. Const. art. III, § 17.

provide the means, methods, or instrumentalities for the accomplishment of the general purpose." *Hercules, Inc. v. South Carolina Tax Comm'n, supra,* 274 S.C. at 141, 262 S.E.2d at 47; *see also Colonial Life & Accident Ins. Co. v. South Carolina Tax Comm'n, supra; McCollum v. Snipes,* 213 S.C. 254, 49 S.E.2d 12 (1948).

Here, the title of the 1986 Appropriations Act provides:

TO AMEND SECTIONS 9–1–10 AND 9–11–10 OF THE 1976 CODE, RELATING TO THE SOUTH CAROLINA RETIREMENT SYSTEM AND THE SOUTH CAROLINA POLICE OFFICERS' RETIREMENT SYSTEM, SO AS TO CHANGE THE DEFINITION OF AVERAGE FINAL COMPENSATION FROM AVERAGE ANNUAL EARNABLE COMPENSATION OF A MEMBER DURING THREE CONSECUTIVE FISCAL YEARS TO TWELVE CONSECUTIVE QUARTERS.

The title of the 1986 Appropriations Act refers to amending § 9–1–10 so as to change the definition of average final compensation. Since the title covers the general subject, the definition of average final compensation contained in § 9–1–10, the statute complies with article III, § 17, and is constitutionally sufficient.

Fourth, the Court has never used the lack of a fiscal impact statement as a factor in statutory interpretation. Moreover, South Carolina Code Ann. § 2–7–72 (Supp.2000) requires the principal author of a bill to submit an estimated fiscal impact statement whenever a bill or resolution necessitating the expenditure of funds is introduced in the General Assembly.[27] As the majority opinion correctly notes, testimony from the principal author of the 1986 amendment is inadmissible evidence of legislative intent. Similarly, the failure of the principal author to submit a fiscal impact statement is not evidence of the General Assembly's intent in amending a statute.

Finally, like the majority, I am also concerned about the fiscal impact of the 1986 amendment on the financial stability of the Retirement System and the State's creditworthiness. However, I question whether adoption of the Employees'

---

**27.** Thereafter, if the legislative committee's estimate is substantially different from the original estimate, the committee must attach its statement of the bill's estimated fiscal impact.

interpretation leaves the Retirement System in the dire financial condition predicted by the Retirement System.

As I read the trial record, the Retirement System's actuary testified the Employees' interpretation of § 9–1–10(17) produces a $1.177 billion unfunded liability if all current retirees and all current active State employees are included in the estimate. This number assumes that all current State employees will remain employed by the State until their retirement, a fact that is highly unlikely. Applying the Employees' interpretation of § 9–1–10(17) solely to current retirees, however, produces a liability of approximately one-fourth the actuary's estimate.

I would hold the language of the 1986 amendment plainly requires that unused annual leave of up to forty-five days may be added to the average produced by the retiree's twelve highest consecutive quarters. Accordingly, I respectfully dissent from Part I of the majority opinion.