611 S.E.2d 240

**Richard WEHLE, Jerry Miller and the Town of Wellford, on behalf of themselves and all others similarly situated, Respondents–Plaintiffs,**

v.

**THE SOUTH CAROLINA RETIREMENT SYSTEM and the South Carolina Budget and Control Board, Petitioners–Defendants.**

No. 25951.

Supreme Court of South Carolina.

Heard Jan. 20, 2005.

Decided March 21, 2005.

Gedney M. Howe, III, of Law Offices of Gedney M. Howe, III, P.A., of Charleston;  A. Camden Lewis, of Lewis, Babcock & Hawkins, L.L.P.;  and Michael E. Spears, of Michael E. Spears, P.A., of Spartanburg, for respondents-plaintiffs.

Richard M. Gergel and W. Allen Nickles, III, of Gergel, Nickles & Solomon, P.A.;  Stephen Van Camp, of South Carolina Retirement Systems, Edwin E. Evans, of S.C. Budget and Control Board;  and Kent Porth, of Nexsen, Pruet, Jacobs & Pollard, LLP, all of Columbia, for petitioners-defendants.

PER CURIAM.

This case is before us in our original jurisdiction asking that we construe S.C.Code Ann. § 9–1–10(4) (Supp.2003) which determines how unused annual leave is figured into the calculation of state retirement benefits.

We recently construed this provision in *Kennedy v. South Carolina Retirement System*, 345 S.C. 339, 549 S.E.2d 243

(2001). *Kennedy* involved the computation of "average final compensation" which is one of the factors used to calculate monthly state retirement benefits. Until 1978, average final compensation was defined under § 9–1–10(17) as:

> the average annual earnable compensation of a member during the three consecutive fiscal years of his creditable service producing the highest average.

As a matter of policy, retiring employees were given credit for unused annual leave in whatever amount had accrued although there was no statutory requirement that such credit be given.

In 1978, the legislature amended § 9–1–10(17) by adding a specific provision regarding unused annual leave:

> an amount up to and including forty-five days termination pay for unused annual leave *may be added to the pay period immediately prior to retirement* and included in the average as applicable.

In 1986, the legislature amended this provision regarding unused annual leave:

> An amount up to and including forty-five days termination pay for unused annual leave at retirement *may be added to the average final compensation.*

The plaintiffs in *Kennedy* claimed the change in the underscored language meant that the credit for unused annual leave should be added *after* the average final compensation is calculated, rather than simply factored into the average as previously provided, resulting in an increased benefit. The trial court found against the plaintiffs on August 19, 1997. On May 22, 2000, we issued our opinion reversing.

We granted rehearing in *Kennedy,* and on December 5, 2000, extensive oral arguments were heard. On May 22, 2001, we refiled our opinion, this time finding in favor of the Retirement System. We held the legislature could not have intended to bestow a benefit on retirees adding $1.177 billion in liability to the Retirement System without any fiscal impact analysis, floor debate, or the provision of additional funding. We concluded the employees' interpretation of the statute would lead to the absurd result of rendering the Retirement System actuarially unsound. Rehearing was denied on July 23, 2001.

Meanwhile, on May 11, 2000, before our original *Kennedy* opinion was issued, an amendment to the 2000–2001 Appropriations Bill was introduced. The amendment recodified the definitions found in § 9–1–10 and alphabetized them. The definition of average final compensation was renumbered as subsection (4) rather than (17), but otherwise it remained unchanged. This amended provision was ratified as part of the Appropriations Bill in Part II, § 67, Act No. 387, on June 22, 2000, one month after our initial decision in *Kennedy*.

The action now before us was commenced on September 24, 2001, two months after we refused to rehear the final *Kennedy* decision. Plaintiffs filed this case as a class action in Colleton County circuit court. The complaint alleges that the Retirement System has failed to add a credit for unused annual leave up to forty-five days to the average final compensation as required by the 1986 amendment to § 9–1–10(17); further, the failure to pay this additional benefit has resulted in overfunding the Retirement System in breach of the System's fiduciary duty. Plaintiffs claim their position is supported by the legislature's ratification of the same definition of average final compensation on June 18, 2000, after our initial *Kennedy* opinion which construed that definition in favor of the employees. Plaintiffs seek payment of the amounts purportedly withheld illegally since 1986.

On October 25, 2001, defendants petitioned this Court to take the case in our original jurisdiction which we granted on December 4, 2001. We appointed then Circuit Judge John W. Kittredge as referee. Judge Kittredge filed his report on February 24, 2004, recommending the complaint be dismissed with prejudice. After careful consideration of the briefs and oral argument in this case, we hereby adopt Judge Kittredge's recommendations as reported below and enter judgment for defendants. Footnotes indicated by an asterisk are ours.

## REFEREE'S ORDER

### *FACTS AND PROCEDURAL BACKGROUND*

The South Carolina Retirement Systems (collectively, the "System") service several groups of state employees, active and retired. Of the four separate pension funds administered

by the South Carolina Budget and Control Board (the Board), this case concerns the two largest funds, consisting of approximately 200,000 active employees and approximately 80,000 former employees in retired status. The South Carolina Retirement System (SCRS) is comprised of state employees, public school teachers and local governmental employees. This action further involves the Police Officer Retirement System (PORS).[1] The SCRS, as of July 2001, had a market value well in excess of $18 billion.

The System is administered under an elaborate statutory and constitutional scheme designed to protect the independence, integrity and actuarial soundness of the funds. The Board is directed to appoint a plan actuary whose responsibilities include the preparation of annual actuarial valuation. S.C.Code Ann. §§ 9-1-230, -240, -260 (1986). The actuarial valuation establishes the foundation for the determination of employer contribution rates and the ongoing monitoring of the actuarial soundness of the various components of the System. The employee contribution rate is set by the General Assembly and the employer rate is set by the Board upon the advice of the plan actuary and the findings and conclusions of the annual actuarial valuation. S.C.Code Ann. § 9-1-1020 (Supp. 2003). The actuarial valuation is relied upon in the preparation of the State's annual financial statement and by outside entities in rating the State for purposes of issuance of bonds.

South Carolina Constitution, Article X, § 16, grants the Board broad powers to protect the fiscal integrity of the retirement funds. Since 1979, the Board has been empowered to determine that no benefit increase granted by the General Assembly can be implemented until the Board first determines that "funding for such increase on a sound actuarial basis has been provided or is currently provided." Section 16 also provides that should the Board determine that any retirement system is not funded on a sound actuarial basis, the General Assembly must provide funding necessary to restore the fiscal integrity of the System. This constitutional provision further protects the accounts of the System from being used for any purpose other than the payment of retirement benefits. In

---

1. The remaining two pension funds, unrelated to this case, are the Legislative Retirement System and the Judicial Retirement System.

this manner, the fiscal integrity of the System is entrusted to the Board, which relies upon its plan actuary to value, on an annual basis, its ability to provide benefits. S.C.Code Ann. § 9–1–230 (1986).

In this action, Plaintiffs seek to re-open and modify official valuations prepared by the plan actuary and relied upon by the Board and General Assembly. Since 1986, the General Assembly has enacted substantial enhancements to retirement benefits, relying upon the official valuations prepared in keeping with the authority delegated to the Board and the plan actuary by statutes and by the State's Constitution. While the granting of relief to Plaintiffs may have unsettling implications in terms of the State's financial condition and the present ability of the system to absorb more debt, Plaintiffs have correctly challenged the System's "scare tactics" at every turn. The success of Plaintiffs' claim depends solely on the matter of legislative intent.

The dispositive issue here, as it was in *Kennedy v. South Carolina Retirement System,* 345 S.C. 339, 549 S.E.2d 243 (2001), is determining the legislative intent in the General Assembly's 1986 amendment to the calculation of "average final compensation," currently codified at S.C.Code Ann. § 9–1–10(4) (Supp.2003).

The South Carolina General Assembly amended the definition of "average final compensation" in 1986 to allow members of the Retirement System to retire throughout the year, rather than require essentially all retirements to occur on June 30, the last day of the fiscal year. As expressly stated in the title of the bill that gave rise to this amendment, its purpose was to "change the definition of average final compensation from average earnable compensation of a member during three consecutive fiscal years to twelve consecutive quarters." 1986 S.C. Act No. 540. No mention was made in the title of the bill of an intent to increase or alter retirement benefits or the benefit formula in any manner. Further, there was no legislative debate or record suggesting that the amendment was in any way associated with a benefit or formula change, and no fiscal impact statement was prepared or provided, which would have been required if there were to be any increase in retirement benefits and costs.

Although inartfully drawn, a member at retirement was allowed to add up to forty-five days of unused annual leave to his or her final pay period, which may or may not have been included in the three highest consecutive fiscal years of salary for purposes of computing the "average final compensation."

Prior to 1986, "average final compensation" was defined as follows:

(17) "Average final compensation" with respect to those members retiring on or after July 1, 1970, shall mean the average annual earnable compensation of a member during the three consecutive fiscal years of his creditable service producing the highest such average; an amount up to and including forty-five days termination pay for unused annual leave may be added to the pay period immediately prior to retirement and included in the average as applicable.

In 1986, the amendment read as follows:

(17) "Average final compensation" with respect to those members retiring on or after July 1, 1986, shall mean the average annual earnable compensation of a member during the twelve consecutive quarters of his creditable service on which regular contributions as a member were made to the System producing the highest such average; a quarter means a period January through March, April through June, July though September, or October through December. An amount up to and including forty-five days' termination pay for unused annual leave at retirement may be added to the average final compensation.

Upon adoption of the amendment, the System interpreted the statute to allow retirement at the end of any quarter and computed the "average final compensation" to be the twelve highest consecutive quarters of salary. Up to forty-five days of unused annual leave could be added as "termination pay" and included in the computation of "average final compensation" regardless of which twelve quarters of compensation were used. For nine years this consistent administrative interpretation went unquestioned by thousands of state employees as they qualified for retirement.

The *Kennedy* suit was commenced in 1995. As noted, the Supreme Court rejected the employees' position and held that the "General Assembly intended the forty-five days of unused

annual leave to be added to the computation [of average final compensation] **before** taking the average of the 12 highest quarters." *Kennedy,* 345 S.C. at 348, 549 S.E.2d at 247 (emphasis in original). Plaintiffs here seek to avoid the holding in *Kennedy* by arguing that the proposed benefit is "affordable."

## RECOMMENDATION

Having carefully considered the record, I am firmly convinced that the General Assembly's intent in 1986 in amending the definition of "average final compensation" is precisely as determined in *Kennedy.* I recommend the Court reject Plaintiffs' position pursuant to the doctrine of *stare decisis.* Should the Court desire to revisit the merits of the claim in *Kennedy,* I recommend dismissal of the complaint for two primary reasons: (1) the matter of legislative intent is not a moving target; and (2) the issue of affordability is largely irrelevant to a determination of legislative intent.

## ANALYSIS

### I. *Stare Decisis*

The Court should honor the *Kennedy* precedent and dismiss Plaintiffs' action, which seeks to relitigate the identical issue, pursuant to the doctrine of *stare decisis.* The doctrine of *stare decisis* enjoys particular efficacy in the context of challenges concerning the construction of statutes and determination of legislative intent. As noted by the Court:

It is manifestly in the public interest that the law remain permanently settled. Especially is this so in the construction of statutes, for if any change in the statutory law is desired, the General Assembly may readily accomplish it.

*Powers v. Powers,* 239 S.C. 423, 427, 123 S.E.2d 646, 647 (1962).

In the event the Court elects to address the merits of Plaintiffs' claim, I offer the following analysis.

### II. Legislative Intent

The determination of legislative intent is a matter of law. *City of Myrtle Beach v. Juel P. Corp.,* 344 S.C. 43, 543

S.E.2d 538 (2001); *Charleston County Parks and Recreation Comm'n v. Somers,* 319 S.C. 65, 459 S.E.2d 841 (1995). Legislative intent, once determined, is "permanently settled" absent subsequent action by the General Assembly to effect a change in the statutory law. *Powers,* 239 S.C. at 427, 123 S.E.2d at 647. Either *Kennedy* is good law or it is not. Plaintiffs certainly cannot be heard to argue that the General Assembly in 1986 intended one result for the *Kennedy* plaintiffs and another result in this action. As *Kennedy* goes, so go these Plaintiffs. In my firm judgment, the record before me serves only to reaffirm the holding in *Kennedy.* I find the evidence concerning legislative history clearly preponderates contrary to Plaintiffs' position. In so finding, I rely heavily on the sound reasoning of the *Kennedy* court.

"The most powerful indication of legislative intent is the lack of legislative history and debate which accompanied" the change in the definition of "average final compensation." *Kennedy,* 345 S.C. at 348, 549 S.E.2d at 247. As the Court further stated:

The history in no way indicates the legislature intended to make such a dramatic increase in benefits. First, the title of the 1986 Appropriations Act, which included the amendment ... did not reference an increase in benefits. [footnote omitted]. *See Ex Parte Georgetown County Water & Sewer Dist.,* 284 S.C. 466, 468–69, 327 S.E.2d 654, 656 (1985) ("The purpose of Article III, § 17 is to prevent the General Assembly from being misled into the passage of bills containing provisions not indicated in their titles.").... The plain language of the title gives no indication or notice that the amendment would triple the dollar value for unused annual leave.

Secondly, had the General Assembly intended to increase benefits and spend $1.177 billion, it is reasonable to assume they would have engaged in floor debate. They did not. [footnote omitted]. Furthermore, no fiscal impact analysis was undertaken. *See* S.C.Code Ann. § 2–7–72 (Supp.1999) (Bills and resolutions requiring expenditure of funds shall have impact statements). [footnote omitted]. Finally, the legislature did not determine whether the increase would impact the actuarial soundness of the State Retirement System as a whole. While we hold the amendment to

section 9–1–10(17) does not violate S.C. Const. art. X, § 16, the fact that the legislature has never funded the increase as required by article X, § 16 is further evidence the legislature did not intend to bestow such an increase when it amended [the definition].

*Kennedy*, 345 S.C. at 349, 549 S.E.2d at 248.

An additional factor weighing against Plaintiffs' position is that application of such interpretation "would allow members to retire with benefits calculated on an 'average' salary which is greater than any salary they earned during employment." *Id.* Another consequence would be the *exclusion* of most public school teachers (who generally do not acquire unused annual leave) from the proposed benefit. It is difficult to imagine that the legislature would intend such a dramatic benefit increase and purposefully exclude teachers from the increased benefit. Certainly, those representing teachers would not sit idly by while all other employee groups were bestowed with an unprecedented and unrequested retirement benefit increase.[2]

In 1986, the cost of the proposed benefit increase would have been $350 million dollars. It borders on frivolity to suggest that the General Assembly intended to spend $350 million dollars on an unprecedented and unrequested benefit without any meaningful discussion. There was neither floor debate nor controversy nor rancor nor funding, for the simple

---

2. Plaintiffs assert that the proposed benefit was indeed requested by Purvis Collins, former director of the System. I disagree. First, the absence of direct evidence has forced Plaintiffs to resort to speculation. I give little weight to such self-serving conjecture. Second, just as Plaintiffs cry foul over the System's reliance on the current director, Peggy Boykin, to establish more recent legislative intent, Plaintiffs are similarly foreclosed from relying on Collins's alleged motives. *See Kennedy*, 345 S.C. at 353, 549 S.E.2d at 250 (rejecting the employees' reliance on the testimony of Purvis Collins to establish legislative intent and recognizing the "settled principle in the interpretation of statutes that even where there is some ambiguity or some uncertainty in the language used, resort cannot be had to the opinions of legislators or of others concerned in the enactment of the law, for the purpose of ascertaining the intent of the legislature"). Nevertheless, the *Kennedy* court deemed Collins's testimony as head of the System relevant, insofar as the executive branch interpreted and administered the 1986 amendment. *Id.* This agency interpretation inures to the benefit of the System's position concerning legislative intent.

reason the General Assembly never intended the so-called *Kennedy* benefit. Moreover, the post-*Kennedy* legislative inaction lends further support to this conclusion. *See Wigfall v. Tideland Utilities, Inc.*, 354 S.C. 100, 580 S.E.2d 100 (2003) (recognizing the presumption that the legislature is aware of court interpretation of statutes, and construing legislative inaction as evidence of the legislature's concurrence with the court's interpretation); *State v. 192 Coin–Operated Video Game Machines*, 338 S.C. 176, 525 S.E.2d 872 (2000) (noting the presumption that the legislature is aware of court interpretation of statutes).

Plaintiffs assert the General Assembly "adopted" the initial *Kennedy* opinion issued by the Supreme Court on May 22, 2000. Plaintiffs' argument overlooks the fact that the initial *Kennedy* decision was *never* final. It is the General Assembly's inaction following the entry of the final judgment in *Kennedy* which is entitled to consideration.*

It is on the issue of funding where Plaintiffs seek to revisit *Kennedy* through the back door. Indeed, the *Kennedy* plaintiffs sought rehearing on the contention that the General Assembly in 1986 provided the funding mechanism for the proposed increase in retirement benefits by the elimination of the longevity pay program. The rehearing petition was denied. *Kennedy v. South Carolina Retirement System*, 349 S.C. 531, 564 S.E.2d 322 (2001). The next line of attack on *Kennedy* is an independent action to set aside the judgment alleging fraud on the court. For purposes of the present claim, this leads to the focus of Plaintiffs' case, the issue of affordability.[3]

---

* Further, as we noted above, the legislature's re-enactment of the definitions in § 9–1–10 was introduced on May 11, 2000, which was *before* our initial decision in *Kennedy* while the appeal of the trial court's decision in favor of the Retirement System was still pending. This legislative action could therefore indicate an intent to confirm the trial court's reading of the statute in favor of Retirement System and not the employees.

3. Plaintiffs' moving-target approach to legislative intent is further reflected in their attempt to merge the issue of legislative intent with that of affordability by drawing this court's attention to the year 2000. Plaintiffs assert that the "System could easily absorb more than $2 billion in new benefits in 2000." I recommend the court reject these efforts, for the sole matter before this court is discerning the General

### III.   Affordability

Plaintiffs' "affordability" argument has expanded well be-
yond the idea that the funding for the claimed retirement
benefit was contemplated in the elimination of the longevity
benefit in 1986.   The transparent weakness of the position
that the new benefit was "swapped" for the elimination of the
prior benefit, I believe, has forced Plaintiffs to scurry for
cover in other areas.   In this regard, Plaintiffs seek to scruti-
nize many of the actions and decisions of the plan actuaries,
the Board and others since 1986, and in some instances even
prior to 1986.   While I do find the proposed benefit was
affordable in 1986, Plaintiffs' claims of affordability are other-
wise manifestly without merit.[4]

The assertion that the 1986 proposed benefit tripling the
value of unused annual leave was a "swap" for the 1986
elimination of the longevity benefit can be dealt with in short
order.   As noted, the cost of the proposed benefit in 1986 was
$350 million; today, the figure is far in excess of $1 billion.
The savings to the System as a result of the elimination of the
longevity benefit was *de minimus*.   For example, in an experi-
ence study from 1980 to 1985, of the 4,416 state employees
who retired, only 132 (or 2.86%) qualified for the longevity
benefit.   Plaintiffs do not dispute these figures but simply
argue that a five-year study is not a sufficiently "mature
experience."   Assuming the accuracy of these figures, even
Plaintiffs' retained actuary, Mr. James Berberian, concedes
the modest savings (the so-called "actuarial gain") from elimi-
nating longevity pay would have a "smaller impact" and be

---

Assembly's intent in 1986 in amending the definition of "average final
compensation."   Plaintiffs are not alone in selectively choosing certain
years, for the System is willing to debate the issue of affordability in
every year except 1986.

4.   I address the matter of affordability for two reasons.   First, the
parties, particularly Plaintiffs, have devoted considerable attention to
the issue.   Second, I wish to provide the Court with a meaningful
response to all issues deemed important by the parties.   By doing so,
the Court can make its own determinations of relevancy. I recommend
the Court determine the matter of legislative intent on a basis other
than affordability.   Affordability in years other than 1986 clearly has no
bearing on the intent of the General Assembly in 1986.   Legislative
inaction, however, since the final judgment in *Kennedy* is some evi-
dence of the General Assembly's concurrence with the Court's decision.

insufficient to pay the staggering costs associated with the tripling of the value of unused annual leave.[5] There is absolutely no nexus between the discontinuance of the longevity pay program and the change in definition of "average final compensation," other than that both items appear in the 1986 Appropriations Act consisting of more than 950 pages.*

The fact remains the benefit was affordable in 1986, and the System offers only token resistance to this indisputable fact.[6] Quite frankly, I view the affordability of the proposed benefit in 1986 as much ado about nothing. The System could "afford" many things in 1986 that it most probably could not today.[7] The critical inquiry is the intent of the General

---

5.  I reject as meritless the testimony of Plaintiffs' expert who opined that the System saved $150 million from the elimination of the longevity benefit.

*  In a similar vein, Plaintiffs rely on a memo written to Rick Kelly, Executive Director of the State Retirement Systems, from Bob Toomey, Chief Administrator of the Budget and Control Board, discussing the impact of our initial decision in *Kennedy*. The memo recommends asking the legislative conference committee to strike a proposal guaranteeing an annual COLA increase of 1% in order to accommodate the increased benefit for unused annual leave under *Kennedy*. Plaintiffs argue the fact that the proposed 1% guaranteed COLA was not included in the 2000 Appropriations Act demonstrates legislative intent that "average final compensation" be interpreted as initially construed by the Court in *Kennedy*. Plaintiffs' theory is simply too speculative to support a finding of legislative intent. There is nothing linking an intended increase in benefits and the General Assembly's ultimate failure to include the proposed COLA guarantee which could have been dropped for any number of reasons.

6.  It appears that the unfounded accrued liability of the System was at that time slightly in excess of $200 million, with a projected amortization period of only four years, well within the thirty-year liquidation period. The System was well situated in the mid to late 1980's to handle new and increased retirement benefits, which were in fact added in the 1980's and 1990's. The increase in retirement benefits, and corresponding increase in the liabilities to the System, has taken many forms, including the recognition in some years of liability associated with cost of living adjustments and otherwise. In later years, more substantial benefits were added, such as the Teacher Employee Retirement Incentive Program (TERI/28) in 2000.

7.  The term "afford" simply reflects the System's then existing ability to absorb additional debt without pushing the amortization period to the brink of the thirty-year mark. Moreover, had the proposed benefit been recognized and funded in 1986, we would now be looking at a vastly different history in terms of retirement benefits and increases through

Assembly in 1986 in amending the definition of "average final compensation." To bootstrap an affirmative finding of legislative intent on the mere affordability of the proposed benefit in 1986 would require the court to ignore the factors typically considered in determining legislative intent, as discussed above, which uniformly lead to the conclusion that the General Assembly in 1986 did not intend the proposed benefit.*

Except for Plaintiffs' argument concerning 1986, their affordability claim is otherwise premised on challenges to the methodologies and assumptions utilized by the responsible parties, including the plan actuaries and the Board. While Plaintiffs' broad brush attack implicates virtually every facet of the System, only three areas warrant discussion: the determination of (1) the "normal cost contribution;" (2) the methodologies to ensure that payment of a future benefit (unfunded actuarial accrued liability, or "UAAL") is accomplished within the thirty-year liquidation period; and (3) an appropriate "load" factor. These issues, to be sure, are not mutually exclusive, for there exists critical interplay between each of these areas.

█ Plaintiffs in general argue that the System, through its actuaries and the Board, has intentionally miscalculated its assets and liabilities to create the illusion that the purported benefit is not affordable. More specifically, Plaintiffs assert that the System has improperly and artificially increased the

---

the years. It is this inability to rewrite history that partly explains Plaintiffs' desire to alter previous years' contribution rates and actuarial methodologies to create an appearance of current affordability. As noted at the end of this section, the affordability focus may also be traced to Plaintiffs' perceptions of the underpinnings of the *Kennedy* decision. The simple and correct answer to this quandary is that the General Assembly in 1986 did not intend to triple the value of unused annual leave.

* A footnote in our *Kennedy* decision specifically states: "Although we find $1.177 billion to be the correct figure, even a quarter of that figure, as suggested by the dissent, would cause dire consequences to the Retirement System." *Kennedy*, 345 S.C. at 352, 549 S.E.2d at 249, n. 15. The fact remains that in 1986 there was no fiscal impact statement, no floor debate, no funding of an increased benefit, and no indication in the title of the 1986 Appropriations Act that such an increase was intended. Our reliance in *Kennedy* on evidence that the increased liability would render the Retirement System actuarially unsound was only one factor in determining legislative intent.

State's contribution to "normal cost," which has the effect of reducing funds available for the employer portion attributable to UAAL to fund future payments. There is no credible evidence to support these arguments. To the contrary, the credible evidence compellingly demonstrates that the professionals charged with managing the System have discharged their duties responsibly and with a commitment to ensure the continued stability and soundness of the State's various pension funds.

Retirement benefits are funded by contributions from the employee and employer. "Normal cost" represents that portion of the employer's contribution, as determined by the Board, necessary to pay the anticipated benefits of active members. For example, in 2001 the contribution levels [were] (i) employee contributions of 6.0% and (ii) employer contributions of 7.55% for State employees and teachers, and 6.7% for other employers. The employer contribution rates are the sum of 4.61% normal cost contribution and a 2.94% (state employees and teachers) or 2.09% (other employees) contribution intended to amortize the unfunded liability. (Defendants' Ex. 15). In properly administering the System's multi-billion dollar pension funds, such critical decisions should be influenced by neither unqualified experts [8] nor creative lawyering. Plaintiffs suggest that a minor change in the "normal cost contribution" from 4.61% to 4% (with a corresponding increase in the UAAL contribution for funding of future benefits) would make the *Kennedy* benefit affordable. Under Plaintiffs' approach, any proposed benefit can appear affordable on paper, provided one is not too concerned with the integrity and overall soundness of the System. The reality is that ostensibly slight changes to the contribution levels can dramatically affect the System's soundness, especially in ensuring that future benefits are paid within the thirty-year liquidation period.

The unfunded accrued liability liquidation period serves as another area where Plaintiffs' proposals would push the system to the edge, and perhaps beyond. In fact, I am persuad-

---

8. Plaintiffs' experts were qualified in the sense their testimony was admissible. I use the term "unqualified" only to register the lack of credence I assign to their testimony.

ed that Plaintiffs' proposals (to make the *Kennedy* benefit affordable) would defeat the System's ability to comply with the thirty-year liquidation period. Plaintiffs claim that the retirement plans are "overfunded" as a result of "excessive contributions," leading to a "surplus." This argument cannot withstand scrutiny. Plaintiffs' actuaries concede the SCRS and the PORS had unfunded actuarial liabilities according to the 2001 Actuarial Valuations that exceeded $2.6 billion. The premise of Plaintiffs' argument is that they have the right to reduce the Board's determination of "normal cost" and thereby shorten the liquidation period. A liquidation period of less than thirty years is viewed by Plaintiffs as a "surplus." Reducing the "normal cost contribution" has the effect of increasing the ability of the System to absorb additional debt. For example, if the liquidation period is twenty years, then the System, according to Plaintiffs, has a surplus of ten years in which to create more debt. "Overfunding" in this context merely describes a system retiring debt sooner than actuarially anticipated. Reducing the "normal cost contribution" has this very effect.

Plaintiffs would be content to reduce the "normal cost," increase debt, and run the liquidation period to (and likely beyond) thirty years, while the System has opted for a more cautious approach. The System's approach allows for a measure of flexibility in the event of lean financial times where the return on investments is less than anticipated. I see absolutely no reason to find fault with the System's philosophy and approach, especially since the System began investing in equity markets. Manipulating the "normal cost contribution" and UAAL portions of the employer contributions to achieve Plaintiffs' desired result would wreak havoc on the System.[9]

---

9. The thirty-year liquidation period is a mandatory policy of the Board, not merely an aspirational goal. The soundness of the System depends on continued compliance with the thirty-year liquidation period. The System, through the Board, has been vigilant through the years to stay within the thirty-year liquidation period. One example of these efforts is the accounting for a liability over a five-year period, known as "smoothing." This accounting adjustment began in approximately 1995 when the System was preparing to transition from book value to market related value. "Smoothing," which is a recognized approach, allows a retirement benefit/debt to be reflected pro rata over a five-year period, thereby avoiding significant fluctuations in a given year. Plain-

It is perhaps significant to note that the benefits supposedly purposefully enacted by the General Assembly in 1986 has no peer in the annals of United States public pension plans. In this regard, even Plaintiffs' experts acknowledge that the proposed benefit has never been contemplated by any public retirement system. The testimony of one of Plaintiffs' experts, Mr. Fred Bass, is particularly instructive. Bass was not a credible witness. His willingness to manipulate data to promote Plaintiffs' cause did not go unnoticed. Bass, however, had some limits in his propensity to advocate for Plaintiffs. Forced to admit that he had never seen a pension plan where unused annual leave is added after average final compensation is computed, Bass described the benefit proposed by Plaintiffs as "extraordinary."

Another illustration of Plaintiffs' fast and loose approach to actuarial methodologies concerns their desire to alter the System's "load" factor. Plaintiffs contend the System has already accounted for the proposed benefit through pre-funding a "load" of 3.5%, which they assert would have been "more than enough" to cover the liability of tripling the value of unused annual leave. A "load" is a factor calculated to project the cost of a benefit. In this instance, the record indicates that prior to 1995, a 1% factor was included as a projected cost of all leave in the retirement benefit formula. During the *Kennedy* litigation, a study was performed by the plan actuary, using a cross section of participants, to calculate an amount attributable to unused annual leave, based upon historical use. This study indicated that including up to forty-five days in the average final compensation formula increased costs to the retirements systems by approximately 2.5% per year. Thereafter, the 2.5% "load" was substituted for the earlier 1% "load." The plan actuaries have never used a composite 3.5% "load" as argued by Plaintiffs. Having never utilized the proposed 3.5% "load," it would be highly inappropriate to retroactively modify methodologies and assumptions utilized in official valuation reports that have been relied upon by the State and others.

---

tiffs' effort to assign nefarious motives to the "smoothing" method simply finds no traction in this record.

In rejecting the various claims of affordability, it is not my intent to disparage Plaintiffs or their excellent counsel, for it is readily apparent they embarked on the affordability abyss not entirely of their own choosing. Plaintiffs perceive the *Kennedy* decision as revenue driven, resulting from the potential impact of recognizing the proposed benefit in the context of the present status of the System. I do not read *Kennedy* as embracing post–1986 affordability as the benchmark for determining legislative intent. In my view, *Kennedy* properly relied on the facts and circumstances surrounding the 1986 amendment to ascertain the intent of the General Assembly at that time. The concerns with the current financial impact of the proposed benefit on the System are, at best, an adjunct to bolster the underlying determination of legislative intent.

## IV. Class Certification

In light of my proposed findings and recommendations, I need not address the issue of class certification.

## *CONCLUSION*

After exhaustively reviewing this voluminous record, I come to the conclusion that the courts should be reticent to intervene in the management of the South Carolina Retirement System. Absent evidence of a gross abuse of discretion, the management and administration of the South Carolina Retirement System must remain with those upon whom the law imposes the responsibility. To permit present and former state employees to cherrypick preferred methodologies and financial projections to advance a particular agenda would irreparably undermine the ability of those responsible to discharge their critical duties and compromise the State's credibility among financial institutions and rating agencies. The wisdom of protecting and maintaining constitutional independence concerning the South Carolina Retirement System is beyond serious challenge.[10]

---

**10.** I do not suggest for a moment that the System, and those individuals charged with the fiduciary duty of managing the System, are beyond the reach of the courts. Upon a proper showing, courts will provide appropriate relief. Where, as here, there is an insufficient showing, the court should recognize, and defer to, the broad range of reasonableness

In sum, in light of *Kennedy,* the application of the doctrine of *stare decisis* would require dismissal of this action. In any event, Plaintiffs have failed to establish that the General Assembly in 1986 intended to triple the value of unused annual leave in amending the definition of "average final compensation." The credible evidence overwhelmingly demonstrates, just as determined by this court in *Kennedy,* that the forty-five days of unused annual leave should be added to the computation of "average final compensation" before taking the average of the twelve highest quarters. I recommend Plaintiffs' complaint be dismissed with prejudice.

**JUDGMENT FOR DEFENDANTS.**

TOAL, C.J., WALLER, MOORE, BURNETT, JJ., and Acting Justice ALEXANDER S. MACAULAY, concur.

---

inherent in determining acceptable actuarial applications and methodologies.